[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The controversies in this case grow out of two decisions of the Danbury Zoning Commission denying the plaintiff's application to change a zone classification from R-40 (1 lot per acre) to RA-8 (5 lots per acre). The first decision involved 48.715 acres of the plaintiff's land on which the plaintiff sought zoning relief to enable him to build roughly 240 single family homes. The second decision, on the plaintiff's modified application, if granted, would have permitted 102[1] houses on 27.4 acres.
The plaintiff characterizes his application as an "affordable housing application" within the meaning of 8-30g of the General Statutes and thus argues that this appeal is an "affordable housing land use appeal" pursuant to that statute and so is entitled to benefit from its provisions. The defendant takes a contrary position and urges the court to treat this appeal as a conventional zoning appeal governed by a well defined set of rules which circumscribe judicial review. Resolution of this threshold dispute is crucial to the proper disposition of the appeal. But first, as in every zoning appeal, the court must find that the plaintiff is aggrieved.
I. AGGRIEVEMENT
Whether the plaintiff is entitled to invoke the provisions of8-30g is irrelevant to the question of whether he is aggrieved. The court need not decide whether 8-30g(b) creates a different basis for standing to appeal because the plaintiff clearly qualifies as an aggrieved person by virtue of his status as the owner in fee simple of the property in question both at the time the application was filed and at all times thereafter to the date of trial. The plaintiff testified to this fact and offered in evidence a certified copy of the deed by which he took title. Consequently, the court finds that the plaintiff has sustained his interest in the property and is therefore aggrieved. Goldfeld v. CT Page 7224 Planning and Zoning Commission, 3 Conn. App. 72 (1985).
II. THE NATURE OF THE APPLICATION
The Commission's initial defense is that 8-30g does not apply to the plaintiff's application and therefore to this appeal, for two reasons. First, it argues that the statute does not apply to an application for a change of zone and second, it asserts that the statute only applies where the application proposes changes in the zoning regulations which "which will ensure the construction of affordable housing if the zone change is granted".
 A.
In support of its first argument the defendant relies on the decision of this court in Lantos v. Newtown Planning and Zoning Commission, 5 Conn. L. Rptr. 216 (1991 Fuller, J.). In Lantos, the court held that the statute does not apply to an application to rezone property but is limited to an application which proposes a specific housing development. The statute defines "affordable housing application" as any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing. "Affordable housing development" is defined to mean "a proposed housing development (A) which is assisted housing or (B) in which no less than 20% of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in 8-39a, for persons and families whose income is less than or equal to 80% of the area media income, for at least 20 years after the initial occupation of the proposed development".
The analysis in this case should begin with an understanding that the abiding purpose of the statute is remedial in character and therefore it should be liberally construed as regards its beneficiaries in order to accomplish its purpose. Reger v. Administrator, 132 Conn. 647, 650 (1946). "`It is a fundamental principle of statutory construction that statutes are to be construed so that they can carry out the intent of the legislature State v. Campbell, 180 Conn. 557, 561 (1980); 2 A. Sutherland, Statutory Construction (4 Ed. Sands, 1984) 45.05. In construing a statute this court will consider its plain language, its legislative history, its purpose and the circumstances surrounding its enactment. Peck v. Jacquemin, 196 Conn. 53, 64 (1985). Dukes CT Page 7225 v. Durante, 192 Conn. 207, 214-15 (1984). Identifying the societal problems which the legislature sought to address may be particularly helpful in determining the true meaning of the statute. State v. Campbell, supra, 562. Each word used by the legislature should be given effect and, as far as possible, the entire enactment is to be harmonized. State v. Grant, 176 Conn. 17,20 (1978). Winchester v. Connecticut State Board of Labor Relations, 175 Conn. 349, 355-56 (1978)." State v. Parmalee,197 Conn. 158, 161 (1985). (Alternate citations omitted.)
Faced with a similar problem in TCR New Canaan v. Planning and Zoning Commission, 6 Conn. L.Rptr. No. 4, 91 (1991) Judge Berger reached a result contrary to the Lantos decision. He held that both principles of statutory construction as well as the legislative history of the statute support the view that the term "any application" was intended to include an application for a change of zone. The disagreement can be traced to the proper meaning to be given to the term "housing development". It could be said that Judge Fuller adopts a restricted view while Judge Berger engages in a more expansive interpretation. The statute does not define "development". In such case "it is proper to look to the common understanding expressed in the law dictionaries". Bolt Technologies v. Commissioner of Revenue Services, 213 Conn. 220,228 (1989). In Ballantine's Law Dictionary, 3d Ed. at 706, the term is defined as "a planned scheme for the construction of houses, street improvements and utilities in a particular area." Additionally, resort to other sections of the general statutes for illustration of the meaning of statutory language is proper. North Haven vs. Planning and Zoning Commission, 220 Conn. 556, 562
(1991). In the context of affordable housing, the legislature has defined "developer" as a non-profit corporation having one of its purposes the "construction, rehabilitation, ownership or operation of housing". 8-39 (u). Both definitions speak in general, comprehensive and inclusive terms. of like generality is the term "propose". To propose is "to put forth for consideration or acceptance", Webster's New World Dictionary, 2d College Ed. at 1140 (1979). This is in contradistinction to the term "project" which our Supreme Court has construed to require a specific plan or design on a specific site. North Haven v. Planning and Zoning Commission, supra at 563. Thus, under this statute, an affordable housing application need be nothing more than a generalized plan for the construction of affordable housing. Nothing in the statute militates against this construction. The term "any" application is as broad as the legislature could have made it. Indeed, an effort to limit the term "application" to proposals for special permits, CT Page 7226 special exceptions and variances and to exclude proposals for changes in zone was expressly rejected by our Supreme Court in the North Haven case, supra at 565.
Moreover, the legislature authorized filing such an application with a "zoning authority". The legislature is presumed to know that zoning commissions are primarily legislative bodies which enact zoning regulations and divide the municipalities up into zoning districts (8-2). While they may also be empowered to approve site plans (8-3 (g)) and special permits, exceptions and exemptions (8-3c), not all zoning commissions are required to act other than legislatively. These statutes allow a zoning commission to assign responsibility for site plans and special permits/exceptions to itself, a planning commission, a combined planning and zoning commission or a zoning board of appeals among other agencies. Summ v. Zoning Commission, 150 Conn. 79, 91
(1962). Assuming that a given zoning commission designated other land use agencies to perform these functions then it would be left with only its pure legislative power, i.e. to adopt and amend regulations and to change zoning classifications and boundaries. If an application for a change of zone, without more, did not qualify as an "affordable housing application" then the legislature enacted mere surplusage when it stated than an affordable housing application may be made to a zoning commission. There is nothing in either the language of the statute or its legislative history which supports the claim that a bare bones application for a change in a zoning classification for a particular piece of property does not qualify as an affordable housing application. In its post trial memorandum, the defendant commends to this court the case of Misky v. Planning and Zoning Commission, 7 Conn. L.Rptr. 16 at 461 (November 19, 1992) as authority for its position that a application which lacks a restriction assuring compliance with8-30g is not an application for affordable housing. The defendant's reliance on Misky is misplaced. As the defendant correctly points out, the application in Misky was made under South Windsor's Moderate Housing program which permits housing units to be sold to people whose income exceeds the statutory limit of 80% of the area media income. Therefore, because 8-30g(a)(1)(B) places an income ceiling on those who may participate in the affordable housing component of a development, the applicant's election to proceed under the South Windsor program rather than in conformance to the guidelines of 8-30g(a)(1)(B) disqualified his application for treatment under 8-30g.
The other ground on which the court disentitled the CT Page 7227 application under the statute is that neither the application nor the record indicated any specific reference to the twenty year statutory limitation. The defendant quotes the following language of the court:
 Without any exact restriction that ensures compliance with the Act, this court believes that this application, albeit well intentioned, cannot be deemed to be an application for affordable housing as defined by the Act, 7 C.S.C.R. at 1318.
The defendant reads this language to mean that the application must contain insurance that the development will actually be constructed with the requisite affordable housing component. Such a reading is overly broad and faulty. The Misky decision holds no more than that in order for an application to qualify as one made in connection with an affordable housing development under8-30g it must on its face or through adequate representations in the record indicate that the development proposed will satisfy the requirements of 8-30g(a). Because the court found that both the application and the record were bereft of any such indication, the application was not entitled to benefit from the provisions of the statute but was rather subject to review as a traditional zoning appeal.
In contrast the application in this case contains the following language. "The property is to be developed as an affordable housing project in conformance and pursuant to Conn. Gen. Stat. relating to affordable housing projects". This statement is broad enough to embrace both assisted housing under subsection (a)(1)(A) or restricted housing under subsection B. The record reveals that at the hearing the applicant declared his election to build restricted housing (Record, P.P. 1344 and 1355). In addition he stated that "a minimum of twenty percent would be devoted to affordable housing as that term is defined by law" and finally he stated that "the maximum cost per unit would be $128,000" (Record P. 1344). There is nothing either in the record or in the defendant's brief that would indicate that these representations fail to satisfy the statutory requirements.
The defendant next argues that this application fails as an affordable housing application because it contains no assurance that affordable housing will in fact be constructed if the zone change is granted. The amicus brief filed by the Connecticut Conference of Municipalities ("CCM") endorses that position.[2]
CT Page 7228 Both of them rest their positions on the language of the statute, its legislative history and existing case law. They reason that it is incumbent upon the affordable housing applicant to design a mechanism which will provide an iron clad guarantee that the housing which he proposes will actually be constructed. For example, the defendant suggests that a purchaser from the applicant would be under no obligation to keep the applicant's commitment. To prevent this, it maintains that the applicant should have "proposed changes to Danbury's regulations" to provide this assurance. C.C.M. expands upon this concept and would require that the guarantee take the form of an amendment to the regulations which would create a special permit/exception or site plan review process. Again, the burden is placed squarely on the applicant. It seems that in response to the imposition of an unprecedented shift in the burden of proof by the legislature, both the defendant and the amicus have fashioned a new burden for the affordable housing applicant which they seek to engraft upon 8-30g in an effort to mitigate their own burden. As previously stated, neither the language of the statute nor its legislative history justifies this attempt.
The advocates of the applicant's duty to provide an iron clad guarantee piously disclaim any right or even power to devise a system of guarantee on their own initiative. They predicate their disclaimer largely upon the principle that Connecticut does not recognize either conditional or contract zoning. In other words, our courts have held that there is no statutory provision which allows a zoning commission to condition a zone change either in its formal resolution of approval or in the form of amendments to the zoning regulations. Neither may the zoning authority enter into a binding contract with a developer to assure the completion of the conditions of approval. The authorities for this enduring rule of law is found in such cases as Lavitt v. Pierre, 152 Conn. 66, 75
(1964), Veseskis v. Bristol Zoning Commission, 168 Conn. 358
(1975); and most recently in Bartsch v. Planning and Zoning Commission, 6 Conn. App. 686 (1986). These decisions are based upon the statutory requirements of 8-2 that "all such regulations shall be uniform for each class or kind of buildings, structures, or use of land throughout each district". They conclude that to permit a zoning authority to enact or contract for special conditions to assure fulfillment of its goals with respect to a particular piece of property would promote the very type of mischief which the statute was enacted to prevent, namely, that there will be no improper discrimination employed by the commission but rather that all owners of the same class and in the same CT Page 7229 district will be treated alike. Bartsch v. Planning and Zoning Commission, supra at 689. As Professor Tondro puts it in his respected treatise, Connecticut Land Use Regulations 2d Ed. at 77, a zoning commission cannot be allowed to create binding agreements on the use of land and thereby limit its successor's ability to make changes in the future.
The rationale of these decisions is similar to that which makes spot zoning an illegal practice. That is, both are condemned because the central purpose of the action is to benefit a single property owner rather than the community at large. Morningside Association v. Planning and Zoning Commission, 162 Conn. 154, 162
(1972). However, both the uniformity and the spot zoning cases recognize an important exception to the general rule. This exception is that these principles do not prevent a zoning authority from imposing specific conditions on the approval of a change in zoning classification so long as the conditions are reasonable and are for the general community benefit rather than for the benefit of a single landowner. Lavitt v. Pierre, supra at 75.
The conditions that would be appropriate to supply assurance that the development proposed would in fact be constructed with the statutory housing component could easily fulfill both prongs of the test if designed properly.
First, as to reasonableness. At the time that the defendant denied both the initial application as well as the modified application, P.A. 91-204 (now Sec. 8-2i) was in effect. Section 8-2i
provides as follows:
 Inclusionary zoning. (a) As used in this section, "inclusionary zoning means any zoning regulation, requirement or condition of development imposed by ordinance, regulation or pursuant to any special permit, special exception or subdivision plan which promotes the development of affordable housing to persons and families of low and moderate income, including, but not limited to, (1) the setting aside-of a reasonable number of housing units for long-term retention as affordable housing through deed restrictions or other means; (2) the use of density bonuses or (3) in lieu of or in addition to such other requirements into a housing trust fund to be used for constructing, rehabilitating or repairing housing affordable to persons or families of low and CT Page 7230 moderate income.
 (b) Notwithstanding the provisions of any special act, any municipality having zoning authority pursuant to this chapter or any special act or having planning authority pursuant to chapter 126 may, by regulation of the body exercising such zoning authority, implement inclusionary zoning regulations, requirements or conditions. (Emphasis supplied).
Since the effective date of the statute (October 1, 1991), zoning commissions in this state now have the express authority to implement inclusionary zoning requirements or conditions. And so, if an affordable housing application omits to include a system of guarantees satisfactory to the commission it is free to draw upon its new statutory power to initiate whatever conditions were appropriate for this purpose. As between the applicant and the commission the legislature is entirely silent concerning the applicant's duty to offer assurances but it has spoken emphatically with regard to a zoning authority's power to initiate such conditions through its legislative power.
Additional statutory authority for the imposition of reasonable conditions may be found in the language of 8-30g
itself. Subsections (b) and (d) expressly authorize a commission to approve an application with "restrictions". Presumably such "restrictions" might include a regulation imposing a condition which promotes the development of affordable housing within the meaning of 8-2i and thus provides the assurance of completion satisfactory to the commission. Even if the commission were reluctant to initiate the condition, it is alternately empowered to deny the application subject to specifically articulated "objections" or "restrictions" which may at that point in the process properly place the burden for devising a system of guarantee on the applicant. Upon consideration of an application which has been modified to respond to these objections or restrictions the commission would then be bound to determine whether the method of assurance proposed was acceptable or whether it should revise the proposal in a manner satisfactory to itself and consistent with the statute.
Yet another option which the commission has at its disposal has already received judicial approbation. Section 8-12 authorizes the zoning official to institute legal proceedings to prevent unlawful maintenance or use of a building or land. There can be no CT Page 7231 doubt that an approved affordable housing development under 8-30g
which fails to implement the essential affordable housing component would subject itself to enforcement action to at least "prevent the occupancy of such building" by someone other than a person of low or moderate income.
But this isn't the only enforcement device available to the commission. Under the authority of Cabinet Realty. Inc. v. Planning and Zoning Commission, 17 Conn. App. 344, 351 (1989) "a municipality may under the authority of 8-12 direct its zoning enforcement officer to record a notice on the land records as a mean by which to enforce compliance with its zoning regulations. Such a notice on the land records will alert prospective purchasers to zoning problems affecting the property and may discourage purchasers from buying property when a builder has not complied with the zoning regulations. Recording a notice on the land records is a legitimate remedy under 8-12 available to a municipality as an enforcement mechanism for a zoning regulation". While the Cabinet Realty case involved curative enforcement action designed to correct a violation, it would be an unwarranted limitation not to allow the recording of such a notice as a preventive measure[3].
Nor do the above described remedies exhaust the supply. Section 8-3 (f) provides as follows: "no building permit or certificate of occupancy shall be issued for a building, use or structure subject to the zoning regulations of a municipality without certification in writing by the official charged with the enforcement of such regulations that such building, use or structure is in conformity with such regulations or is a valid, non conforming use under such regulations".
Under this statute the zoning official could not only prevent occupancy of affordable housing units by other than persons of low or moderate income by refusing to issue a certificate of conformity of use, but the building official is not authorized to even issue a building permit for the building housing the use without such a certificate from the appropriate municipal official. See, Tondro, Connecticut Land Use Regulation at 213. Such attention to detail has assumed new importance because the date of the initial occupancy by the permitted use is vital to a proper monitoring of the twenty year provision contained in 8-30g(a)(1)(A).
It is curious that the defendant complains that unless an application for affordable housing contains a system of guarantee CT Page 7232 it cannot approve the application because it has no means on its own to monitor compliance. Assuming that the application satisfies the commission's unspecified requirements in this regard, the question arises as to how it would propose to monitor and assure compliance with a) the rent and sales price limitation, b) the income limitations and c) the restrictive covenant set forth in8-30g(a)(1)(A). The record does not disclose that any such monitoring mechanism is in place under the Danbury zoning regulations. But there is more than a rhetorical answer to this question.
Section 8-2g, passed by the legislature in 1988, authorizes a zoning commission to provide by regulation for density bonuses to promote construction of affordable housing. It also authorizes a municipality to enter into a contract with a developer to provide for such housing which contract must contain certain specific provisions. Upon the adoption of such regulations the statute outlines a procedure which ultimately leads to the appointment of a municipal agency to implement the affordable housing program and to oversee the sale or rental of the units in accordance with approved criteria. According to the statute, this agency could be the municipal housing authority or the municipal agency with responsibility for housing matters. Admittedly, the plaintiff's application did not seek nor involve a development to which density bonuses would apply, so 8-2g has no direct application to this case. However, there is nothing that has occurred since 1988 that has prevented Danbury from putting in place a density bonus program under the statute. Had it done so, it would have had a mechanism on line to implement, monitor and oversee the plaintiff's development to give itself the assurance that it now protests is lacking. But even in the absence of such a program, whether intentional or the result of benign neglect, it would make little sense to argue that in this field of affordable housing the authority to do so is exclusive to 8-2g.
Independent of this affordable housing statute a municipality has the power under 8-169a to 8-240 to create a Community Development Agency or a Housing Site Development Agency or a Human Resource Development Agency for the purposes authorized in those statutes and to assign to any of these agencies the responsibility for monitoring and overseeing compliance with the affordable housing component of the statute.
Thus, there is ample authority for the Commission to have imposed a reasonable condition on the approval of the application. CT Page 7233 The second prong of the test is whether the condition specified promotes general community benefit or is intended to benefit only the landowner. There can be no question that such a condition would not only promote benefit in the community of Danbury, but the region and indeed the entire state. As this court stated in Pratt's Corner Partnership v. Southington Planning and Zoning Commission, 9 Conn. L. Rptr. No. 10, 291 (July 26, 1993) "the general statutes are replete with legislative expression of the long standing statewide need for affordable housing both as defined in 8-39a and 8-39g." That opinion catalogs the recent amendments to our zoning statutes in the field of affordable housing so there is no need to repeat them here.
This court holds therefore, that a zoning authority enjoys full authority to approve an application for an affordable housing development under 8-30g subject to conditions and restrictions reasonably necessary to assure that the development will in fact be constructed and used for the stated purpose. Accordingly, the plaintiff's application for a change in zoning classification of his property is an application made in connection with an affordable housing development within the meaning of 8-30g.
III. THE SCOPE OF REVIEW
Under 8-30g(c) the legislature has shifted the burden of proof from the plaintiff to the defendant Commission. The statute requires that both the commission's decision and the reasons it cites for its decision be "supported by sufficient evidence in the record". Both the plaintiff and the defendant agree for the purpose of this appeal that "sufficient evidence" means the same as "substantial evidence" as defined by our Supreme Court in Huck v. Inland Wetlands Agency, 203 Conn. 525, 539 (1987). In its brief, the defendant acquiesces in the application of this standard because it believes that it has sustained its burden of proof under the statute but suggests nevertheless that it may not be the correct standard. This court likewise perceives that other possible interpretations exist but that this case is not an appropriate vehicle in which to make that determination. See, Pratt's Corner Partnership v. Southington Planning and Zoning Commission, supra at 291.
IV. THE DEFENDANT'S BURDEN OF PROOF.
Before considering the individual reasons assigned by the commission in support of its decision there is an argument which CT Page 7234 underlies and predominates in the defendant's case which ought to be dealt with initially. The defendant claims that at the time of this application the City of Danbury had an affordable housing stock of 8.6% as certified by the Connecticut Department of Housing which at the time of trial had increased to 9.8%. The defendant moved to expand the record under 8-8 (k) of the General Statutes to include this updated data but the motion was denied for the reasons stated at the time of trial and for the reasons which follow.
The defendant urges that 8-30g(c)(3) requires it to apply a balancing test in determining whether the public interests which the commission has cited in support of its denial "clearly outweigh the need for affordable housing". The defendant reasons that the percentage of acceptable housing stock is relative to the importance of the public interest to be protected. The defendant would employ a sliding scale in the balancing test so that the closer a municipality came to the exemption limit of ten percent (Section 8-30g(f)) the less weighty need be the public interest and the greater the probability that the public interest relied on will outweigh the need for affordable housing. The defendant is not alone in this view. See, Zoning "For the Living Welfare". The Status of Affordable Housing Litigation in Connecticut, 10 Conn. Real Est. L. J. 1 at 5 (1992). Judge Berger however, took a contrary view in TCR New Canaan, supra at 104. I agree with Judge Berger that the legislature decided the issue of need when it determined that those municipalities which fall below the 10% baseline shall be subject to the terms of 8-30g. Thus, all municipalities subject to the act are on the same footing whether their record is .01 or 9.9.
The legislature was very careful in writing the statute not to restrict the scope of the need for affordable housing only to the municipality. To be sure, the statute speaks in terms of municipalities but only because it is only municipalities that have zoning commissions whose regulatory jurisdiction is co-terminus with the boundaries of the municipalities which they serve. Indeed, in 1991 by P.A. 91-392 the General Assembly for the first time mandated that zoning regulations "encourage the development of housing opportunities . . . for all residents of the municipality and the Planning region in which the municipality is located". The act goes on to provide that "such regulations shall also promote housing choice and economic diversity in housing, including housing for both low and moderate income households, and shall encourage the development of housing which will meet the housing needs identified in the housing plan prepared pursuant to 8-37t and in CT Page 7235 the housing component and the other components of the state plan of conservation and development prepared pursuant to 16a-26".
Of course in 1991 the legislature is presumed to be aware of the precise language of 8-30g. Knoll v. Kelley, 142 Conn. 592, 595
(1955). Section 8-37t refers to a Statewide Housing Needs Assessment for four separate economic classes. There can be little doubt that the legislature has, through these amendments to 8-2, introduced into Connecticut a version of the Mount Laurel Doctrine. Southern Burlington County NAACP v. Township of Mount Laurel,336 A.2d 713 (1975).
These amendments as well as numerous others made in recent years, see, Pratt's Corner Partnership v. Southington, supra, clearly reflect not so much a concern for housing conditions in individual municipalities but rather a more comprehensive statewide concern for the problem. When a particular municipality exceeds the 10% threshold it not only extricates itself from the strain of the statute but it contributes to the amelioration of a statewide condition.[4]
The need for affordable housing is a part of the equation that is given by the legislature. The weighing process then is between the given element of need and the public interests which the commission indicates are substantial. In performing the balancing test then the commission must assess the magnitude of the public interest which may vary from case to case, against the element of need which is fixed. This skewed approach is not unprecedented. As Westbrook points out at p. 191, the Freedom of Information Act requires a public agency to engage in a balancing test in determining whether the private interest in withholding documents "clearly outweighs" the public interest in disclosure. Section1-19 (b)(1). In Wilson v. FOIC, 181 Conn. 324, 329 (1980) the element of public disclosure was deemed to be the general rule, thus establishing disclosure as a constant in the equation in requiring the public agency to evaluate the importance of the public need for confidentiality against the public's fundamental right to know.
V. THE DEFENDANT'S REASONS
Before proceeding to consider the reasons phase of the appeal a further recitation of the facts is essential. On November 6, 1991 the defendant denied the plaintiff's application to rezone his 48 acre parcel of land from RA40 to RA8. The rezoning would have permitted construction of approximately 240 single family detached CT Page 7236 homes of which the affordable housing components would have been 48. The property is bounded on the north, east and south by the RA40 zone and on the west by the LI40 (light industrial) and the CCD (corporate development district). The actual uses are predominantly single family residential having a density of 2.13 to 5.6 houses per acre. The entirely westerly boundary borders the Boehringer Ingelheim Limited complex which consists of several low profile, pharmaceutical manufacturing and office uses.[5] A portion of the westerly boundary separates Danbury from the Town of Ridgefield. The property has some frontage on five public highways all of which are improved except for Briar Ridge Road, which while open and passable to some vehicles, is unimproved. Briar Ridge Road has a fifty foot right of way. The property is located within the watershed of Lake Kenosia which the record indicates constitutes an emergency water supply for the City of Danbury. Approximately 21 acres consist of wetlands.
In his appeal, the plaintiff has taken advantage of his option under 8-30g(d) to attack not only the commission's decision on his modified application but also the original decision. While this is his right under the statute, all of the argument and most of the briefing relates to the commission's second decision of February 10, 1992 denying the modified application. In the absence of a specific request to dispose of the original decision first, the court will assume that the modified application is the preferred and viable application and will accordingly confine its decision to that application. The reasons given in support of the denial are found at p. 1153 of the record. Notwithstanding the plaintiff's contrary suggestion, these reasons are deemed to represent the collective judgment of the commission. Protect Hamden/North Haven from Excessive Traffic and Pollution, Inc. v. Planning and Zoning Commission, 220 Conn. 527 (1991). In this case, the defendant stands on its reasons even though it suggests that should the court find them inadequate, it should search the record as the Appellate Court admonished trial courts to do in Stankiewicz v. Zoning Board of Appeals, 15 Conn. App. 729, 732 (1988). In Protect Hamden, supra at 545, the Supreme Court declined to decide whether Stankiewicz is inconsistent with the rule that "where a zoning agency has formally stated the reasons for its decision, the court should not go behind such official collective statement to search the record for other reasons supporting the decision. DeMaria v. Planning and Zoning Commission, 159 Conn. 534, 41 (1970). Likewise, this court need not engage in such an exercise because page 1153 of the record reflects a formal collective act of the commission which occurred on January 28, 1992. CT Page 7237
Whether these recent developments in our zoning case law are applicable to the court's review under 8-30g is likewise an open question. The defendant has certainly not requested that the court search the record insofar as the decision on the modified application is concerned. Whether the court is under an obligation, sua sponte, to conduct such an inquiry when the plaintiff claims that the reasons are inadequate is an issue that must be decided by this court.
In the TCR New Canaan case, supra at 101, Judge Berger said "the burden shifting scheme in this present statute underscores the need for the agency to cite its reasons. It would be extremely difficult for a reviewing court to search the record and decide whether the public interest of health, safety and other appropriate matters cannot be protected by reasonable changes to the proposed development. That decision belongs to the agency. It is thus fair to said that an agency that denies an application and doesn't cite the reasons for its decision would clearly be putting its decision in great jeopardy".
In Pratt's Corner Partnership, supra at 293, this court said "in order to comply with the statute and sustain its burden of proof when it denies an application for an affordable housing development, the zoning authority must specifically articulate through the reasons it gives how and why each of the precepts embodied in subsections (2), (3) and (4) support its denial. In other words, the assigned reasons must address categorically (1) the necessity to protect a particularly identified public interest or interests; (2) must reflect that the commission engaged in the balancing test dictated by subsection (2); and (3) must manifest an honest effort to devise reasonable changes to the development that would protect the public interest that is jeopardized by the proposal. A decisional format that presents anything less than this abdicates the zoning authority's solemn responsibility and impedes meaningful judicial review. Nothing less should be required under a remedial statute of this nature. Keyes v. Brown,155 Conn. 469, 474 (1967). At the same time the reasons may not need to be in a form to satisfy the meticulous criterion of a legal expert. Protect Hamden, supra at 554."
The teaching of Stankiewicz is that "in searching the record the trial court may rely on any reason culled from the record which demonstrates a real or reasonable relationship with the general welfare of the community". Id. at 733. This proposition is easily CT Page 7238 applicable to the numerous considerations which a zoning commission may apply under 8-2 of the General Statutes. For example, a reviewing court can comfortably determine whether the record adequately demonstrates that the application would cause "congestion in the streets" or "the overcrowding of land". But8-30g(c) adds a new dimension to judicial review. How can a trial court be expected to cull from the record that there are substantial public interests which clearly outweigh the need for affordable housing? To do so would be to do the job of the commission and to substitute itself for the commission. Tarasovic v. Zoning Commission, 147 Conn. 65, 71 (1959). It is not for the court to perform the balancing test mandated by subsection (3) but rather for the commission to do so and for the court to review that performance. Subsection (4) makes it even clearer that a record search under 8-30g is inappropriate. Under subsection (4) the commission is required to consider any reasonable changes which may be made to the proposal in order to protect the public interest. To require the court to glean from the record what reasonable changes could have been made when the commission has suggested none transforms the court into an adjunct zoning commission and violates the most basic principles known to our body of administrative law.
For these reasons it is impermissible for this court to search the record regardless of the claimed inadequacy of the articulated reasons.
Neither side has urged the court to consider two recent cases decided by our Supreme Court which are relevant to the subject of searching the record. Gagnon v. Inland Wetlands and Watercourses commission, 213 Conn. 604 (1990) held that where a wetlands agency has failed to state its reasons, a reviewing court is bound to search the record in an appeal under 22a-42 through 22a-45
notwithstanding that these statutes (as do the zoning statutes) require the wetlands agency to "state upon the record the reasons for its decision".
In the second case, Samperi v. Inland Wetlands Agency,226 Conn. 579 (1993), the court held that notwithstanding that22a-41 (b) requires that a finding be made on the record, with the reasons therefor, that a feasible and prudent alternative does not exist, an agency is not required to make an explicit finding on the record to this effect and its decision will be upheld if a search of the record reveals that there was an adequate basis for the agency's decision. The court stated that the agency "is required only to manifest in some verifiable fashion that it has made a CT Page 7239 finding of no feasible and prudent alternative" Id. at 593.
These cases are distinguishable and therefore not controlling. The primary reason for this is that under 8-30g the legislature has shifted the burden of proof from the applicant to the zoning authority. A zoning commission's historically passive role has been transformed to a proactive one based upon a particularized need to benefit a special class of persons. Since it has the burden of proof it must state its reasons on the record in order to satisfy that burden.
Next, the similarity of language that the court found existing as between the inland wetlands statutes and the planning and zoning statutes does not obtain here. The language of 8-30g is unique and is patterned after neither.
Finally, the reason which the Gagnon court found to be the most cogent was that these agencies are made up of lay persons who cannot be expected to comply with "multitudinous statutory mandates" Id. at 611. That court repeated this public policy principle in Samperi. This court believes however, that as important a public policy goal as that is, it is outweighed by the public policy behind 8-30g that a special, unique procedure be designed to fill as expeditiously as possible, a deprivation which has long existed within certain economic classes of our society.
Reason Number 1. The proposed density is too high for the proposed area it was in the plan of development as an RA-40 zone and it should remain that way. Confining review to the modified application, and thus the commission's second decision, the proposal calls for developing only the northerly twenty-seven acres of the site to produce the hundred and two single family units, of which at least twenty will be affordable. For the reason set forth at Part II of this opinion, the commission has the power to hold the plaintiff to this number.
Generally, a municipal plan of development adopted under 8-23 of the General Statutes is advisory only except as to municipal improvements and subdivisions as to which it is controlling. Purtill v. Town Planning and Zoning Commission, 146 Conn. 570
(1959). One would expect a zoning commission to be guided by the plan. Mott's Realty Corp. v. Town Planning and Zoning Commission152 Conn. 535, 538 (1965). In fact, consistency of a zoning commission's action with a plan of development has usually been recognized as a valid and proper reason to support the agency's CT Page 7240 action. Calandro v. Zoning Commission, 176 Conn. 439, 441 (1979). Effective October 1, 1991 the legislature gave added importance to a municipal plan of development by mandating that a commission "state on the record its findings on boundaries or changes thereof with the plan of development". P.A. 91-398.
Curiously, the plan of development land use map for the city of Danbury adopted in 1978 shows a city divided up into proposed use districts but does not indicate density for any of these districts. As to the subject property, the map proposes single family homes. Other residential uses shown are for single, multi-family, high rise, residential and office uses. So, contrary to the defendant's statement, the plan of development does not recommend this property for RA-40 classification but merely for single family residential.
On the other hand, the issue of density may stand on its own feet irrespective of the silence of the plan of development. Zoning for density is clearly a proper goal for a zoning commission under 8-2. Issues of density are usually fairly debatable. Lurie v. Planning and Zoning Commission, 160 Conn. 295, 309 (1971). At the same time, since 1984 (P.A. 84-263), zoning commissions have been required to adopt regulations to "encourage the development of housing opportunities for all citizens of the municipality consistent with soil types, terrain and infrastructure capacity". This language has been interpreted by our Supreme Court not only to be mandatory but also to be broad in scope. In Builders Service Corporation v. Planning and Zoning Commission, 208 Conn. 267, 305
(1988) the court construed this provision to require a zoning commission to encourage such housing "not just in some zones for some citizens but for all citizens of the municipality". (Emphasis supplied) Further, the court stated that what the zoning commission has done in other zones is irrelevant because what is done in those zones does not apply to all citizens.
Significantly, there is nothing in the record which shows the impact which this density would have on the neighborhood or on the city as a whole. The record does, however, show that the average density in the neighborhood is 2.9 (R.P. 11.) housing units per acre whereas the plaintiff's proposal calls for 3.8 units per acre (27 acres divided by 102 units). While much of this neighboring property is zoned RA-40, it is legally non-conforming as to area and frontage. Thus, the density proposed is roughly thirty one percent higher than what exists. Frequently, density issues relate to traffic, neighborhood and environmental impacts. Such is not CT Page 7241 the case here because those impacts are dealt with separately by the commission in subsequently articulated reasons.
In West Hartford Interfaith Coalition Inc. v. Town Council of West Hartford, 7 Conn. L. Rptr. 10 (September 28, 1992) the court was faced with a similar situation albeit on a much smaller scale. In that case, the zoning authority denied the application for affordable housing because, inter alia, the density of the project was too great. The increase in density would have gone from four units to ten units, over twice the approved density. The court found nothing in the record to support the reason which the court characterized as nothing more than a "statement of concern" Id. at 23. Similar too was the general statement made by the planning and zoning commission in Primerica v. Planning and Zoning Commission,211 Conn. 85, 100 (1989). There, the commission stated that multiple occupancy of an office building as opposed to single occupancy would lead to greater congestion during peak hour traffic. The trial court found and the Supreme Court affirmed that there was nothing in the record to support such a statement.
On the contrary, in this case the record indicates that the planning department endorsed the proposal as a suitable transitional zone between existing residences and the light industrial zone bordering the property on the north.
In order to qualify as a legitimate basis for denial of this application, density must represent a substantial public interest in "health, safety or other matters which the commission may legally consider". Section 8-30g(c)(2). Thus, it is not just a public interest which the commission must seek to advance but that public interest must be substantial. While established rules of statutory construction would approve resort to a dictionary definition of substantial (strong, solid, firm, stout, Webster's New World Dictionary, 2d College Ed. at 1420) judicial gloss for the provision may be obtained in federal case law as well. In adopting a substantial public interest test the legislature can be presumed to be aware of the report of the Connecticut Blue Ribbon Commission on Housing, (February 1, 1989) which discussed both state and federal judicial decisions affecting housing. It appears that from that body of law the legislature borrowed the "compelling governmental interest" test and its burden shifting characteristics and devised its own "substantial public interest" test. See, Kennedy Park Homes Association v. City of Lackawana, 436 F.2d 108
(2d Cir. 1971); U.S. v. City of Black Jack, Missouri, 508 F.2d 1179
(8th Cir. 1975); Huntington Branch NAACP v. Town of CT Page 7242 Huntington, supra. In U.S. v. City of Black Jack, Missouri, the court outlined a three part test for determining whether any of the reasons advanced rose to the level of a compelling governmental interest. That test requires both a qualitative and quantitative analysis. Id. at 1187, n. 6 and 7. The legislative history of8-30g seems to support this test. 32 H.R. Proc. Pt 30, 1989 Session, 10, 642.
An examination of the record reveals that this density based reason reflects nothing more than the commission's value preference to maintain the current classification. "A town's preference to maintain a particular zoning category . . . is normally based on a variety of circumstances. But that does not relieve the court of weighing the town's justification against the adverse effect that the plaintiff would suffer by the denial." Huntington Branch NAACP v. Town of Huntington, supra at 937. In this case the record is barren of any evidence that a density based preference is supported by "a substantial public interest".
Reason Number 2. The increase in traffic and the detrimental effect on fire safety would make an adverse situation. The record reveals that the city traffic engineer advised the commission that the plaintiff's project would be expected to generate "a relatively high level of traffic". He went on to say that improvement of Briar Ridge Road would serve as the appropriate access to and from the site and that Old Ridgebury Road had adequate capacity to accommodate the expected traffic congestion. Furthermore, he noted that the site is close to Route U.S. 6 and I-84 interchanges.
On this topic, the plaintiff submitted a study prepared by Barkan and Mess Associates, Inc. Traffic Engineers, which proposed three alternative plans of ingress and egress. Each of the three would be adequate with the construction of certain specified improvements. The study concluded that the project is "not anticipated to generate significant volumes of traffic through existing subdivision roads".
Traffic impact is an area of concern that usually involves neighborhood opposition. This case is no exception. As Judge Berger said in TCR New Canaan, supra at 106, quoting from a Kansas case, "zoning is not to be based upon the plebiscite of the neighbors. Their wishes are to be considered but the final ruling is to be governed by the basic consideration of the benefit or harm involved to the community at large." Arkenberry v. City of Topeka,421 P.2d 213, 219 (1966). This admonition is specially applicable CT Page 7243 to a development that will contain an affordable housing component. The fear of an influx of families of low and moderate income into an established neighborhood of single family homes tends to alarm the citizens and promotes embellished statements of probable harm to the point where they frequently become pretextual.
On the other hand, this commission was not required to accept the contents of the traffic engineer's report. Manor Development Corp. v. Conservation Commission, 180 Conn. 692, 697 (1980). In matters readily within their competence, commission members may rely on their personal knowledge especially when the information relates to traffic congestion. Forest Construction Co. v. Planning and Zoning Commission, 155 Conn. 669, 675 (1967). On the other hand, the plaintiff's evidence was uncontroverted by any other expert. Feinson v. Conservation Commission, 180 Conn. 421 (1980) would seem to require that if the commission relied on traffic data, experience or projections in reaching these conclusions it must disclose it and give an opportunity for rebuttal in order to avoid acting arbitrarily. Here, the requirement that the reason reflect a substantial public interest makes it imperative that the commission disclose the traffic data upon which it relied. How else can the court determine whether the commission has met its burden of proof as to substantiality of the public interest.
This reason also introduces the notion of fire safety. There is nothing in the record that suggests that any particular fire hazard would be created by this development. Presumably, the jeopardy to fire safety is related to an increase in traffic. Clearly fire safety occupies a very high position in the hierarchy of public interests to be protected. The record is devoid of any evidence that the traffic which would be generated by this development would have any effect whatsoever on fire safety.
Related to this reason is the defendant's claim that if viability of the development were to depend upon improvement to Briar Ridge Road, the commission's approval made conditional upon the happening of this event would render the approval void. The short answer to this claim as the plaintiff points out is that the use of Briar Ridge Road though preferred by the City's Traffic Engineer, is not essential since the project can be served adequately and safely by existing public highways which are already improved. The defendant argues that there was no evidence in the record that the Danbury Planning Commission would approve the improvement of Briar Ridge Road if the zoning commission approved the zoning application. The record is clear that the planning CT Page 7244 commission recommended against approval of the plaintiff's rezoning application.
The most recent pronouncement on this issue is found in Blaker v. Planning and Zoning Commission, 212 Conn. 471, 472 (1989) Wherein the court stated "in Lurie v. Planning and Zoning Commission, supra 307, we held that `when an exception or special permit is granted and the grant is otherwise valid except that it is made reasonably conditional on favorable action by another agency or agencies over which the zoning authority has no control, its issuance will not be held invalid solely because of the existence of any such condition". (Emphasis added). Our holding was intended to achieve greater flexibility in zoning administration by avoiding stalemates between a zoning authority and other municipal agencies over which it has no control. Id. Nowhere did we intimate, therefore, than in order to be valid, conditional approval requires evidence that the other agency will act favorably on the future request. Such a holding in the present case would require evidence of the probability of future approval before the conservation commission has had an opportunity to review the site plans as revised. Further, it would be contrary to the policy of allowing a planning and zoning commission `to make the first move and the decision as to the conditions under which it would approve the issuance of a permit . . . . This is so even though the project may subsequently fail to materialize because one or more of the conditions has for any reason not been met.' Id. We conclude, therefore, that the phrase "reasonably conditional" in Lurie contemplates giving the other agency, over which a planning and zoning commission has no control, the opportunity to review the revised plans, thereby furthering the goal of cooperative action among municipal agencies, and that the record need not indicate whether the conservation commission is likely to approve the revised site plans."
Because in 1991 the planning commission recommended against approval does not necessarily mean that the same attitude would prevail today or at some later date. Several factors could operate to reverse this attitude, i.e.: a change in membership of the commission, a change in condition of the neighborhood or in the city, an updating of the plan of development. There is no justification to assume in advance that the planning commission has already made up its mind concerning the improvement of Briar Ridge Road when it has seen nothing more than a generalized proposal for a change of zone. CT Page 7245
The defendant has failed to sustain its burden of proof as to this reason.
Reason Number 3. The environmental issue that there could be considerable impact on the Lake Kenosia watershed. Lake Kenosia is a body of water called a "river diversion" which serves as an auxiliary water supply for the City of Danbury. It is unclear from the record the extent to which the lake has been utilized for this purpose. At trial, both counsel agreed that it was infrequent. The issue before the commission was what impact would this development have upon the Lake Kenosia watershed and hence the water supply?
The expert testimony before the commission was uncontroverted by any other expert testimony. The City Superintendent of Public Utilities, William Buckley, testified that both public utility water and municipal sewerage facilities were readily available to the site. This obviated any risk associated with either degradation of the underground water supply by the installation of on site wells or contamination of the Lake Kenosia watershed as a result of underground leaching of septic effluent. He also stated that Lake Kenosia is an exception to the sewer avoidance policy of the city because the Lake Kenosia watershed is already occupied by uses which are 55% industrial or commercial, and for this reason the area is intended to be served by city sewers. He explained that because the lake is a flood skimming operation it is not going to be regulated like a regular watershed area. He concluded that the plaintiff's proposal would not threaten the water supply anymore than it is threatened by the kind of activities that are already there.
Jack Kozuchowski, the City Environmental Coordinator, advised the commission that requiring that the sewers be placed on both the north and south side of the property "would reduce the nutrient loading on the lake which is really relevant to the commission's interest and would eliminate many of the problems". Although it does not appear as part of any of the reasons, the principal concern of the commission appeared to be the possible harmful effect on the lake caused by nutrient loading from the development. The issue was explored extensively at the hearings.
Henry Moeller, a soil scientist, called by the plaintiff testified that "essentially all practical and suitable measures have been incorporated into this project to protect the wetlands soils and also the water quality coming off the property". He CT Page 7246 further opined that because the developer could be required to install detention basins to catch most of the nutrients, the flow of the property would be less than it is now. He said that "even with the worse case of an overwatered, highly fertilized lawn, that the total nitrogen in both surface runoff and subsurface seepage coming from the plot, the amount of nitrates in the water in terms of concentration remain below drinking water standards".
Jeanne Williamson, the plaintiff's engineer testified that she was "confident that the plan will protect the . . . wetlands and therefore discharge no phosphates to the downstream receiving watercourses". She stated that "with the erosion and sedimentation controls and storm water management practices proposed and previously approved by the Environmental Impact commission, this project will have no adverse impact upon Lake Kenosia. The impact upon Lake Kenosia from this property will be reduced by lessening the amount of siltation from the site with erosion and sedimentation control measures and detention/sedimentation basins." Sometime in the middle 1980's the City of Danbury created the Lake Kenosia Commission to protect the lake. The city however has no regulations governing activities in the Lake Kenosia watershed. The Lake Kenosia Commission is advisory only and has no regulatory powers. Through its chair-person, R. A. Carlson, it recommended against approval of the initial application but did not take a formal position with respect to the modified application. The recommendation is found in a letter dated November 12, 1991 in which the commission advised that the "increased potential housing density can have a significant adverse impact on surface and ground water quality of the Kenosia Aquifer Watershed." (Emphasis added) The chairperson attached reports and correspondence which generally discuss conditions in the watershed and lake. The commission did not submit a report relating specifically to the plaintiff's development proposal nor did it offer any expert testimony. In fact it failed to point to any definite or even reasonably likely harm that it prognosticated would befall the lake and its watershed. Not only was the fear generalized but it was highly problematical. No effort was made to evaluate the modified proposal. The same uncertainty pervaded the defendant's deliberations and ultimate decision. Curiously, the defendant not only fails to identify the possible impact but fails even to characterize it as negative. The defendant was however justified in speaking in terms of possibilities ("can") rather than probabilities because there is nothing in the record that supports anything but a mere possibility. CT Page 7247
A zoning commission is entitled in the exercise of its discretion to "consider the effects that are likely to flow from proposed amendments to a zoning regulation, and may decide, within proper statutory parameters, that it would be unwise policy for the town to countenance these effects." (Emphasis added). Protect Hamden/North Haven from Excessive Traffic and Pollution, Inc v. Planning and Zoning Commission, supra at 548. A similar exercise, only in reverse, was undertaken by the Planning and Zoning Commission in Connecticut Resource Recovery Authority v. Planning and Zoning Commission, 225 Conn. 731 (1993). In that case the commission had before it evidence that it was possible that a solid waste disposal site could be operated safely over a regulated aquifer. The trial court was reversed because it determined that because this possibility existed it was irrational for the zoning commission not to allow the disposal site. The Supreme court held that evidence of a possibility of safe operation was insufficient to outweigh other contrary evidence which the commission had before it. Consistent with the above decision, this court holds that in this case the unsubstantiated possibility that the affordable housing development will have an adverse effect on this water supply is not a substantial public interest entitled to protection under the statute.
Reason Number 4. The need for affordable housing does not clearly outweigh the need to preserve the neighborhood as it presently exists. This reason reflects an effort to perform the balancing test prescribed by 8-30g(c)(3). The fundamental flaw of in the performance is two-fold. First, as discussed at length in part IV above the defendant has misconstrued the meaning and scope of the term "need". No further discussion of this point is necessary. But even if the defendant had correctly interpreted "need" the commission balanced the need not against any of the public interests identified in the first three reasons (density, traffic, fire safety, Lake Kenosia) but against a new so called public interest "preservation of the neighborhood." It is true that the planning commission reported to the defendant its belief that the plaintiff's request will change the character of the neighborhood. This opinion was based clearly on the increase in density. However, the planning commission used the RA-40 zone as its benchmark when in fact most of the RA-40 zone is already developed with non conforming lots which create a density that is much closer to the density proposed by the plaintiff. Certainly, zoning in accordance with existing conditions has never been a legitimate purpose of zoning. See, Section 8-2. On the other hand, preserving a neighborhood both as an exclusive enclave for CT Page 7248 non affordable housing is not so substantial a public interest as to outweigh the need for affordable housing. "A town's preference to maintain a particular zoning category . . . is normally based on a variety of circumstances. But that does not relieve the court of weighing the town's justification against the adverse effect that the plaintiff will suffer by the denial" Huntington Branch NAACP v. Town of Huntington, supra at 937. In this case it is not the plaintiff's interests that would be harmed in the weighing process but the interests of persons and families of low and moderate income who would be excluded. Besides, denial of an application for affordable housing on the grounds of "preservation of the neighborhood" is subject to abuse and should to be scrutinized very carefully.
It is apparent from the record that the commission was mindful of the provisions of 8-30g and even received legal advice from its attorney concerning its requirements. Notwithstanding, the record is devoid of any attempt by the commission to determine that the public interest which is cited "cannot be protected by reasonable changes to the affordable housing development." As this court said in Pratt's Corner Partnership, supra, "the reasons assigned by the commission must manifest an honest effort to devise reasonable changes to the development that would protect the public interest that is jeopardized by the proposal." The defendant has failed to satisfy its statutory obligation in this regard.
In conclusion, the defendant has failed to sustain its burden of proof as to any of the considerations which it was required to apply under 8-30g(c). The decision and the reasons cited for the decision are not supported by sufficient evidence in the record.
VI. RELIEF
Section 8-30g(c) empowers the court "wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." The plaintiff urges the court to reverse the defendant's decision because there is insufficient evidence in the record to support it. The defendant argues for a remand for reasons which this court does not find persuasive. However, there are cogent reasons in this particular case why remand rather than reversal is appropriate.
The commission obviously operated under the mistaken belief that it was powerless to devise any strategy which would assure CT Page 7249 completion of the development containing an affordable housing component as proposed. In part II. B. above, this court has endeavored to disabuse the commission of that notion. Accordingly, it is only fair that the commission be given an opportunity to adopt whatever mechanism it deems proper to accomplish this purpose.
Next, the commission will have an opportunity to reconsider the issues of density, traffic, fire safety and watershed protection not so it can make its reasons review proof but so it can take a second look at whether they are viable at all in the context of this decision.
Perhaps the most important reason for remand is that the commission failed to recognize its responsibility under8-30g(c)(4). There is nothing in the record, to say nothing of the assigned reasons, to indicate that the commission gave any consideration to any "reasonable changes" to the development which the plaintiff could have incorporated into his plan and which would have accommodated the commission and yet not have had a "substantial adverse impact on the viability of the affordable housing development." Section 8-30g(b). Unlike "objections or restrictions" which are referred to in subsection (d), reasonable changes under subsection (c)(4) are not limited to the commission's initial decision. See, Pratt's Corner Partnership, supra at 16. Finally, P.A. 91-204 (8-2i) had become effective just prior to the commission's decision. The commission should be free to avail itself of this express statutory power upon reconsideration.
In Mobil Oil Corporation v. Zoning Commission, 30 Conn. App. 816
(1993) the court held that it was error for the trial court to remand a special case permit application when it resolved all the issues in favor of the applicant. Likewise here, the court has resolved all the issues in favor of the plaintiff and therefore the court orders that the plaintiff's modified application be approved under such terms and conditions as the commission might reasonably prescribe within the parameters of this ruling. For this purpose and to this end, the decision is hereby remanded to the commission. Such action shall be completed within ninety days unless extended by the court for good cause shown.
MOTTOLESE, J. CT Page 7250