METROPOLITAN DISTRICT *v.* TOWN OF BARKHAMSTED
(2632)

HULL, BORDEN and DALY, Js.

---

Argued October 10—decision released December 18, 1984

*Bourke G. Spellacy,* with whom were *Karen P. Blado* and *Michael J. Whelton,* for the appellant (plaintiff).

*Wesley W. Horton,* with whom were *David L. Fineberg, David B. Losee* and, on the brief, *Charles M. Rice, Jr.,* for the appellee (defendant).

HULL, J. This case involves the proper basis for assessing land owned by the plaintiff, the Metropolitan District, and used for reservoir purposes in the defendant town of Barkhamsted, on the tax assessment lists of 1979, 1980, and 1981. The underlying facts are not in dispute.

The district is a specially chartered municipal corporation which owns 6628 acres of land in the town. The land consists of a reservoir and associated watershed area used to meet the needs of member towns and non-member customers of the district. In a dispute over the tax assessment on its land, the district argued that the per acre value of its land was $118.65; the town claimed that the land value was $1900 per acre. The district appeals from the judgment of the trial court valuing

its land at $1800 per acre, claiming error in the court's application of the property tax assessment provision of the special act which created it.

The district was created in 1929 by a special act of the Connecticut General Assembly. 20 Spec. Acts 1204, No. 511.[1] The charter, as amended by 21 Spec. Acts 655, No. 505, provides as a method of real estate tax assessment that land shall be "assessed for taxation at the average assessed valuation per acre of the improved farming land in such town." See Part I, infra.

On October 1, 1979, the town's tax assessor assessed the district's property at $1900 per acre. The district appealed this assessment to the board of tax review of the town. Upon the board's refusal to change the assessment, the district appealed to the Superior Court.[2]

The court determined that the true and actual value of the property was $11,930,400, representing an $1800 per acre valuation.[3] The court rejected the district's claim that General Statutes §§ 12-107a through 12-107c[4] applied to its land in the town. The court found that the land had never been classified under those sections and that the legislature never intended those sections to be used in determining the value of water company property.

---

[1] The special act, as amended, is also known as and will be referred to as the charter of the district.

[2] By amendment dated June 28, 1983, the district added the assessment years beginning on October 1, 1980, and October 1, 1981, to its original application.

[3] From this figure the value of the land is reduced, for tax purposes, by 30 percent as is done for all land. General Statutes § 12-62a (b).

[4] General Statutes §§ 12-107a through 12-107c provide a procedure for reduced assessments for farmland if certain criteria are met. A detailed discussion of these statutes is found in Part II B, infra.

The court did not further consider the question of the possible existence of improved farmland[5] in the town or its average assessed value per acre. It proceeded, without explaining the reasons for not applying the charter assessment provision, to determine the assessment value of the district's property on the basis of testimony by the town's appraiser, James Oles, and common knowledge of increasing farmland values. The court reduced the assessment per acre to $1800, which it labeled a "conservative figure," agreed to by the town.

The tax assessor of the town testified that $118.65 was the average assessment per acre of the farmland in the town. A document posted at the town hall showed various farmland classifications and a schedule of recommended use values pursuant to General Statutes §§ 12-107a through 12-107e.[6] Tillable land is classified, in descending order of quality from best to worst, as "Tillable A," "Tillable B," "Tillable C1" and "Tillable C2." "Permanent Pasture Land" is defined as "Untillable Land." The term "improved farmland" is not used in the document. The entire assessment of farmland consists of 254.6 acres classified as "Tillable C2" and 427.9 acres classified as "Permanent Pasture." For the years 1979, 1980 and 1981, "Tillable C2" farmland was assessed by the town at $150 per acre and "Permanent Pasture Land" at $100 per acre. These values were based on the list of statewide and river valley recom-

---

[5] While the charter used the term "farming land," General Statutes § 12-76 has used the term "farm land" since 1963. We consider these two terms to be synonymous. For simplicity, this opinion will refer throughout to "farmland" except where the term is used in quoted textual material.

[6] The relevant provisions of General Statutes §§ 12-107a through 12-107e were added as part of Public Acts 1963, No. 490. General Statutes §§ 12-107d and 12-107e provide mechanisms for obtaining "forest land" or "open space land" classifications, respectively. Those sections are, therefore, not involved in this case.

mended use values per acre provided to towns by the state tax commissioner. The resulting calculation is as follows:

|  | Number of Acres |  | Assessment/ Acre |  | Total Assessment |
|---|---|---|---|---|---|
| Tillable C2 | 254.6 | x | $150 | = | $38,190 |
| Permanent Pasture | 427.9 | x | 100 | = | 42,790 |
|  | 682.5 |  |  |  | $80,980 |

Thus, $118.65 per acre, computed as $80,980 for 682.5 acres, is the average assessed valuation per acre of farmland in the town. This $118.65 per acre valuation reflects the fact that the owners of all farmland in Barkhamsted have applied for and received classification of their land as farmland under General Statutes §§ 12-107a through 12-107c.

The district proffered only two witnesses. The first of these was the town assessor, Mary Ringuette. She testified as follows: There is no improved farmland in the town; her definition of such land is "land along the river valley or along some flat land that is not slopey, not rocky, so it's able to have a tractor go through and plant crops" such as lettuce or tobacco, as distinguished from hay; tillable C2 land is not improved farmland; she stated that her opinion is consistent with those of the other assessors at the Hartford County and Litchfield County assessors' meetings.

The other witness was Leon C. Kirk, a senior engineer with the real estate department of the district. He examined assessment cards in the assessor's office for land classified as farmland, being all of the tillable C2 land and pasture land. These cards show that if all of the town's farmland were assessed without the preferential statutory reduction, the average assessment per acre would be $963.54, or $874.14 if farmland located in a business zone were excluded.

Kirk testified that in his opinion "tillable C2 and pasture land do come within the definition of improved farmland." The trial court specifically found that the district tried the case without a competent appraiser.

James C. Oles, an expert appraiser with twenty-six years of experience, testified for the town. He prepared a report for trial estimating the fair market value, in a sale, of improved farmland from a willing seller to a willing buyer. He did not consider any farmland within the town despite the fact that there are four working dairy farms in the town and despite the land classified as farmland by the assessor.

Oles testified that the reason he did not consider existing farms in Barkhamsted in determining the value of the district's land is that the only "improved farming land" in the town is now under water as the "reservoir was built by the Metropolitan District on the best land that existed in the Town of Barkhamsted." He defined "improved farming land" as "prime crop land cleared, the absolute best farmland there is." He used farmland values from other towns in Litchfield County with similar market conditions for farming.

The district briefed three major issues: (1) that the court erred in interpreting the property tax assessment provisions of the charter; (2) that the court erred in its interpretation of the relationship of the charter to General Statutes §§ 12-63, 12-76 and 12-107a through 12-107c; and (3) that the court erred in setting the assessment at $1800 per acre.

The appellee also briefed, as an alternate ground upon which the judgment may be affirmed pursuant to Practice Book § 3012 (a), whether General Statutes § 12-76, as amended in 1963, repealed by implication the assessment provision of the district's charter.

## I

## STATUTORY HISTORY

In *West Hartford* v. *Board of Water Commissioners*, 44 Conn. 360 (1877), the Supreme Court held that a reservoir owned by a municipal corporation in another town was not liable to taxation in the latter town. This case prompted adoption of the original predecessor of General Statutes § 12-76, which stated: "Land owned or taken by any municipal corporation for the purpose of creating or furnishing a supply of water for its use or benefit, shall be liable to taxation, and shall be set in the list in the town where such land is situated, to the corporation owning or controlling such water supply, *at a valuation which would be fair for said land if used for agricultural purposes:* provided, however, that no such land shall be liable to taxation, or set in any list as aforesaid, wherever the inhabitants of the town in which the said land is situated have the right to the use of such water supply upon the same terms and conditions as the inhabitants of such municipal corporation, and when such town actually uses the same." (Emphasis added.) Public Acts 1879, No. 79. Thereafter, the legislature altered the language "for agricultural purposes" as follows: "land shall be liable to taxation and shall be assessed . . . *at the average assessed valuation per acre of the improved farming land in town."* (Emphasis added.) Public Acts 1913, No. 156.

In 1929, the district was created by 20 Spec. Acts 1204, No. 511. This act contained no section specifically on taxation of its water supply property until, in 1931 for the East Branch of the Farmington River and again in 1949 for the West Branch, the Charter borrowed the identical language of the 1913 Public Act: "[A]ll land taken for any of said purposes shall be set in the list

for taxation in the town in which said land is situated, to the Metropolitan District, and assessed for taxation at the *average assessed valuation per acre of the improved farming land in such town."* (Emphasis added.) 21 Spec. Acts 655, No. 505, § 14; 25 Spec. Acts 1162, No. 444, § 10.

In 1963, the pertinent portion of the present § 12-76 was amended to state: "[S]uch land shall be liable to taxation *and shall be assessed in the town in which such land is situated to the corporation owning or controlling such water supply at what would be its fair market value were it improved farm land."* (Emphasis added.) Public Acts 1963, No. 490, § 10.[7]

## II

### THE RELATIONSHIP OF THE CHARTER TO GENERAL STATUTES § 12-63, 12-76 AND 12-107a THROUGH 12-107c

### A

### Whether the Charter Provision Was Repealed by Implication by General Statutes § 12-76

We will first consider the town's alternate position that General Statutes § 12-76, as it read prior to the 1982 amendment; see footnote 7, supra; is applicable to this case.

The trial court decided the case in favor of the town with reference to the language of the charter. Thus, the court did not consider the town's alternate argument that General Statutes § 12-76 rather than the charter applied to this tax appeal. This is a pure issue of law briefed by the district. The issue is also in the preliminary statement of issues of both parties. Thus,

---

[7] General Statutes § 12-76 was amended in an immaterial respect in 1978 and in 1982 the district charter was made explicitly subject to § 12-76. Public Acts 1982, No. 82-452, § 1.

the issue is properly before this court. *Cochran* v. *McLaughlin,* 128 Conn. 638, 644, 24 A.2d 836 (1942).

In 1963, the relevant portion of General Statutes § 12-76 was changed to provide that land of a municipal water supply corporation be "assessed . . . at what would be its fair market value were it improved farm land." Public Acts 1963, No. 490, § 10. The town claims that this amendment repealed the assessment provision of the charter by implication and was applicable to the 1979, 1980 and 1981 assessment lists. In the same legislative session, General Statutes § 12-63 was amended to provide preferential tax treatment for farm land as follows: "RULE OF VALUATION. The present true and actual value of *land classified as farm land pursuant to section 12-107c, as forest land pursuant to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be if such open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. The present true and actual value of all other property* shall be deemed by all assessors and boards of tax review to be the fair market value thereof and not its value at a forced or auction sale." (Emphasis added.) Public Acts 1963, No. 490, § 9.

In *East Haven* v. *New Haven,* 159 Conn. 453, 271 A.2d 110 (1970), a special act in 1929 had granted to New Haven the right " 'to establish and maintain an airport within the limits of said city and the town of East Haven and to acquire property as a site for such airport, either by purchase or by condemnation proceedings under the provisions of the general statutes.' " *East Haven* v. *New Haven,* supra, 463. The 1929 General Assembly had also enacted two general statutes about airports consistent with the special act. In 1946,

the General Assembly adopted the predecessor of General Statutes § 15-79. This statute did not expressly repeal the 1929 special act, but did so by implication.

The Supreme Court stated: "This section, known as § 15-79 of the General Statutes, in effect at the time of trial, was a drastic change in legislative policy from [allowing airports in another town without the town's approval]. It prohibited municipalities from purchasing or taking land in any other municipality for the establishment, expansion or improvement of an airport without the approval of that municipality. The state itself was prohibited from establishing, expanding or improving any airport without the approval of the municipality or municipalities concerned. This was a patent shift of policy from one permitting extension of municipal airports into other municipalities with no power in the towns so invaded to prohibit it to one prohibiting not only all municipalities from so doing but the soverign as well, unless the permission of the municipality concerned was first obtained." *East Haven* v. *New Haven,* supra, 466–67.

It then summarized the law on repeal by implication as follows: "[T]he general rule is that '[a] special and local statute, providing for a particular case or class of cases, is not affected by a statute general in its terms, broad enough to include cases embraced in the special law, unless the intent to repeal or alter is manifest.' *State ex rel. Wallen* v. *Hatch,* 82 Conn. 122, 124, 72, A. 575 [1909]. 'But whenever it is made to appear that the legislature intended to repeal a special act by any general legislation, then the special act falls, although not named. And such intention may be made to appear by the words of the general act, by the subject-matter with which the general act is concerned, by other legislation on the same matter, by the surrounding circumstances, by the purpose to be accomplished, or by anything else to which reference may properly be had

for the purpose of discovering the legislative intent.'
*Hartford* v. *Hartford Theological Seminary,* 66 Conn.
475, 484, 34 A. 483 [1895].

" 'When a subsequent enactment covering a field of
operation coterminous with a prior statute cannot by
any reasonable construction be given effect while the
prior law remains in operative existence because of
irreconcilable conflict between the two acts, the latest
legislative expression prevails, and the prior law yields
to the extent of the conflict.' 1 Sutherland, Statutory
Construction (3d Ed.) § 2012, p. 463. 'There is no rule
which prohibits the repeal by implication of a special
or specific act by a general or broad one. The question
is always one of legislative intention, and the special
or specific act must yield to the later general or broad
act, where there is a manifest legislative intent that
the general act shall be of universal application not-
withstanding the prior special or specific act.' 50 Am.
Jur. 565, Statutes, § 564." *East Haven* v. *New Haven,*
supra, 467–68.

In upholding the trial court's enjoining New Haven
from expanding its airport into any portion of East
Haven unless permission was first obtained from East
Haven, the court stated: "We conclude that the sub-
ject matter of § 15-79 covers the whole field of the
establishment, expansion and improvement of airports
in the state. This later statute is exclusive, and its pro-
visions are manifestly repugnant to the 1929 special
act." Id., 471–72. Repeal by implication is not favored.
*Hirschfeld* v. *Commission on Claims,* 172 Conn. 603,
606, 376 A.2d 71 (1977); *Knights of Columbus Council*
v. *Mulcahy,* 154 Conn. 583, 591, 227 A.2d 413 (1967).
"If courts can by any fair interpretation find a reason-
able field of operation for both statutes without destroy-
ing or perverting their evident meaning and intent, it
is the duty of the courts to do so, thus reconciling them
and according to them concurrent effect. *Leete* v.

*Griswold Post,* 114 Conn. 400, 405, 158 A. 919 [1932]; *Costa* v. *Reed,* 113 Conn. 377, 385, 155 A. 417 [1931], and cases cited; 1 Sutherland, Statutory Construction (3d Ed.) § 2014." *Shanley* v. *Jankura,* 144 Conn. 694, 702, 137 A.2d 536 (1957).

Each party cites *Rocky Hill Convalescent Hospital, Inc.* v. *Metropolitan District,* 160 Conn. 446, 280 A.2d 344 (1971) and *Miller* v. *Eighth Utilities District,* 179 Conn. 589, 427 A.2d 425 (1980), as authority for its position. The district claims these two cases as authority for the generally accepted proposition of *East Haven* v. *New Haven,* supra, that the intent to repeal or alter must be manifest before an earlier special act is repealed by implication by a later general statute. The town points out that in each case the subsequent public act specifically stated that all prior charters and special acts were to continue in effect.

Such arguments essentially beg the question, for each situation is unique. In *East Haven* v. *New Haven,* supra, there was an essential repugnancy, for the special act involved required no approval for location of an airport in any town while the later general statute required such approval. These provisions are diametrically opposed. The Supreme Court, in finding repeal by implication, specifically noted the comprehensive nature of the later general statute.

We find nothing in the legislative history of the charter and General Statutes § 12-76 to display a manifest intent that the charter provision is repealed by the later general statute. Rather than an essential repugnancy, the two methods of assessment can live together compatibly as two different but related methods of achieving the same objective.

"[T]he legislature is presumed to be aware and to have knowledge of all existing statutes and the effect which its own action or nonaction may have on them."

*Miller* v. *Eighth Utilities District,* supra, 594, citing *Mack* v. *Saars,* 150 Conn. 290, 298, 188 A.2d 863 (1963); Holden & Daly, Connecticut Evidence, § 50.

We conclude that the charter provision for assessment of the district's land in the town was not repealed by implication by the provision of General Statutes § 12-76, adopted as § 10 of No. 490 of the 1963 Public Acts.[8]

B

The Application of General Statutes §§ 12-107a through 12-107c to Assessment of Improved Farmland Under the Charter

In 1963, the General Assembly enacted No. 490 of the Public Acts, entitled "An Act Concerning the Taxation and Preservation of Farm, Forest, and Open Space Land" in order to revise the tax structure, thus enabling owners of such land to continue its environmentally sound use free from the pressure to sell caused by tax rates based on increasing market value created by encroaching residential and commercial development. See General Statutes § 12-107a.

General Statutes § 12-107c permits owners of land to apply to the tax assessor to have their land classified as farmland. General Statutes § 12-107c (a) provides that "in determining whether such land is farm land, such assessor shall take into account, among other things, the acreage of such land, the portion thereof in actual use for farming or agricultural operations, the productivity of such land, the gross income derived therefrom, the nature and value of the equipment used in connection therewith, and the extent to which the

---

[8] Although the district's statement of issues claimed that the trial court misinterpreted the application of General Statutes § 12-63 to this case, the district concedes, in its brief, that General Statutes § 12-63 is inapplicable to this case.

tracts comprising such land are contiguous." If the land is classified as farmland, pursuant to General Statutes § 12-63 its valuation is based on its current use as farmland without regard to more intensive neighborhood land use, in contrast to property which is to be valued at its fair market value.

The district's land has never been classified as farmland under General Statutes § 12-107c (a). The district, however, claims that the trial court erred in not giving it the benefit of General Statutes § 12-107c in determining the assessment of its land.

This claim is disposed of by *Meriden* v. *Board of Tax Review,* 161 Conn. 396, 288 A.2d 435 (1971), in which the Supreme Court held that Meriden could not have its water supply land, located in the town of Berlin, classified as forest land under General Statutes § 12-76. The state forester had granted Meriden forest land classification but the Berlin tax assessor refused to recognize that classification. On appeal the trial court sustained the plaintiff's appeal and reclassified the property in question from "improved farmland" valued at $214,560 to "forest land" valued at $22,350. In finding error, the Supreme Court stated: "The legislative history of § 12-76 and the plain, unambiguous language of the statute make it clear that it was the intention of the legislature to exempt from taxation land owned or taken for water-supply purposes by a municipality in the town where the land is situated, provided that town's inhabitants are given the use, and actually use, the water supply, on the same terms as the inhabitants of the town which owns the land. Since the inhabitants of Berlin did not share in this use, it was the intent of the legislature that the town of Berlin should not lose the tax on the land so used. It was the purpose of the statute to restore this exempted land to the assessment list of the town of Berlin and that it should be assessed at its fair market value as improved farmland. *Norwalk*

v. *New Canaan,* 85 Conn. 119, 126, 81 A. 1027 [1911]. *There is nothing in either of these statutes to support a claim that the provisions of § 12-107d repealed by implication or in any way amended or modified the method of assessment required by § 12-76.*" (Emphasis added.) Id., 403.

The district attempts to distinguish *Meriden* because a special act provision is involved in this case. We conclude that the distinction is immaterial and adopt the rationale of *Meriden.*[9]

Three factors buttress the conclusion that the General Assembly did not intend that the district's water supply land in the town be favorably assessed by permitting it to sneak under the tent of a farmland classification under General Statutes § 12-107c.

First, General Statutes § 12-107b (a) defines "farm land" as "any tract or tracts of land, including woodland and wasteland, constituting a farm unit." There is no such claim here. Second, the statutory factors for determining what is farmland under General Statutes § 12-107c (a) are clearly inapplicable to the district's land in Barkhamsted. Third, as the Supreme Court observed in *Johnson* v. *Board of Tax Review,* 160 Conn. 71, 73, 273 A.2d 706 (1970): "It is thus clear that §§ 12-107a [through] e, as derived from Public Act 490, are as much conservation statutes as they are tax relief measures. The declaration of policy in § 12-107a recites, inter alia, that it is in the public interest 'to conserve the state's natural resources.' Indeed, it would appear

---

[9] In *Torrington Water Co.* v. *Board of Tax Review,* 168 Conn. 319, 362 A.2d 866 (1975), the Supreme Court upheld the trial court's direction that the plaintiff's land should be classified as forest land under General Statutes § 12-107d. The Supreme Court distinguished *Meriden* v. *Board of Tax Review,* 161 Conn. 396, 288 A.2d 435 (1971), since General Statutes § 12-76, as adopted in § 10 of No. 490 of the 1963 Public Acts, applied only to water supply land owned by municipalities. Since that case involved a private water company it is not germane to the issues in this case.

that the purpose of the tax relief is to aid the conservation effort . . . ." Since the district's water supply land is subject to restrictions on its sale, the conservation purpose of General Statutes § 12-107c would not be enhanced in any way by giving the benefit of the favorable farmland assessment to the district's land. 20 Spec. Acts 1204, No. 511, § 53; see also General Statutes §§ 16-50c, 22a-355, 25-37a through 25-37g.

We conclude that General Statutes § 12-107c is inapplicable to the assessment of the district's land in Barkhamsted.

## III

### THE STANDARD OF "IMPROVED FARMLAND"

The trial court did not define the phrase "improved farmland." The memorandum of decision merely cites the charter provision concerning assessment of improved farmland. The town argues that by basing its decision on the fair market value of other farmland in Litchfield County the court impliedly found that there was no improved farmland in the town. We do not reach the question of whether, in the absence of any improved farmland in the town, the court would have been justified in considering the factors that it did consider. In the absence of an appropriate definition employed by the trial court, there was no proper standard by which to weigh the facts presented by this record. Thus, the fundamental issue in the case was never considered.

The assessor spoke in assessor's language, defining "improved farmland" as land "able to have a tractor go through and plant crops." She acknowledged that she classified approximately 255 acres of Barkhamsted land as tillable C2, suitable for crop land. She relied on a "Recommended Use Values/Acre" notice from the state tax department which was concerned with

values of land seeking the benefits of General Statutes §§ 12-107a through 12-107c. She concluded that there was no improved farmland in the town despite her knowledge of four working dairy farms on the list of farmland, assessed under No. 490 of the 1963 Public Acts, which she prepared for Kirk.

The appraiser, stipulated to be an expert land appraiser, spoke in appraiser's language. He defined "improved farming land" as "prime crop land cleared, the absolute best farmland there is." He applied the standard of fair market value. By his definition, he could find no improved farmland in the town except the land under the reservoir.

The district's project engineer used both tillable C2 and pasture land in his computations since this was all of the assessed farmland available in the town. He testified that in his opinion these two categories of farmland "do come within the definition of 'improved farmland.'" He did not specifically give his definition of "improved farmland."

None of the definitions used at the trial is directly relevant to the statutory standard of *improved* farmland. Both the assessor and the appraiser considered farmland from the standpoint of its potential use. This is a practical everyday standard for the municipal assessor. Requiring assessments to change with various changed improvements on farmland would be a much more onerous task.

The fundamental problem here, however, is that "improved farmland" is a statutory term never before defined in Connecticut, and that all of the witnesses were marching to their own particular drummer.

The charter provides that water supply land of the district "shall" be assessed in the manner provided in the charter. "[T]he word 'shall' must be assumed to

have been used with full awareness of its ordinary meaning." *Graham* v. *Zimmerman,* 181 Conn. 367, 371, 435 A.2d 996 (1980). "Shall" is a word ordinarily creating a mandatory duty. *Shulman* v. *Zoning Board of Appeals,* 154 Conn. 426, 428–29, 226 A.2d 380 (1967).

"[W]here the language of the statute is clear and unambiguous the courts cannot, by construction, read into statutes provisions which are not clearly stated." *Point O'Woods Assn., Inc.* v. *Zoning Board of Appeals,* 178 Conn. 364, 366, 423 A.2d 90 (1979); Holden & Daly, supra.

There is a dearth of authority on the definition of "improved farmland." In *Norwich* v. *Lebanon,* 193 Conn. 342, 350, 477 A.2d 115 (1984), the Supreme Court referred to the statutory phrase found in General Statutes § 12-76 but did not define it. In *O'Connell* v. *Remington,* 102 Conn. 401, 407, 128 A. 710 (1925), the testator's will provided that "at Dexter Remington's decease the avails arising from the improvement of the farm" were to be equally divided between certain parties. The Supreme Court stated that "[i]n creating the life estates in *Dexter,* the testator obviously uses the word improve in its familiar sense of a beneficial use." The court further stated: "We think the gift in question must be construed as a gift of the proceeds arising from the use or working of the farm." *O'Connell* v. *Remington,* supra, 407.

In *Johnson* v. *Frederick,* 163 Ala. 455, 50 So. 910 (1909), § 12-47 of the Alabama code provided that partition fences between "improved lands" shall be erected at the joint expense of the occupants. The plaintiff sued the defendant to compel her to pay a portion of the expense of erecting a partition fence. The evidence was that the plaintiff had enclosed her lands with a wire fence, consisting of posts with four stands of wire attached thereto, and was and had been using her said

lands as a pasture for her cows and horses. In confirming the trial court's award to the plaintiff, the court stated: "The history of this legislation, as to the building of partition fences between lands of adjoining owners under certain conditions, and requiring the adjoining owners to pay for the same, seems to have had its origin in the colony of Massachusetts. There, and in other states of the Union where this legislation has been enacted, the term 'improved lands' has been held to mean lands appropriated by the owner and devoted to a particular use—used or employed to good purpose, or turned to profitable account. *Wiggin* v. *Baptist Society,* 43 N. H. 260, 261 [1861]. We therefore hold that appellant, having fenced her land in and devoted it to the use of pasturage for her cows and horses, and thereby turned it to profitable account, made it improved land within the contemplation of section 4247 of the Code." *Johnson* v. *Frederick,* supra, 459.

The leading case in Connecticut involving the definition of "farmland" gives cogent guidelines for our task of interpretation in this case. In *Johnson* v. *Board of Tax Review,* 160 Conn. 71, 273 A.2d 706 (1970), the defendant board had sustained the assessor's refusal to classify the plaintiffs' land as "farmland." The land was fully cultivated as a nursery. The trial court sustained the plaintiffs' appeal, concluding that the land should have received preferential tax treatment under General Statutes §§ 12-107a through 12-107c as "farmland." Although General Statutes § 12-107b is devoid of any specific definition of farmland, the court resorted to the general statutory definitions and common word usage to determine that cultivated nursery land constitutes "farmland" within the purview of General Statutes §§ 12-107a through 12-107c.[10]

---

[10] The statutory definition of "farming" provided by General Statutes § 1-1 (q) leaves no doubt that "farmland" includes land used for a broad range of purposes: "Except as otherwise specifically defined, the words

"Where a statute or regulation does not define a term, it is appropriate to focus upon its common understanding as expressed in the law and upon its dictionary meaning. *The Hearst Corporation* v. *State Department of Assessments & Taxation*, 269 Md. 625, 308 A.2d 679 (1973)." *Ziperstein* v. *Tax Commissioner*, 178 Conn. 493, 500, 423 A.2d 129 (1979).

Webster, Third New International Dictionary, defines the word "improve," in part, as follows: "[T]o increase the value of (land or property) by bringing under cultivation, reclaiming for agriculture or stock raising, erecting buildings or other structures, laying out streets, or installing utilities as sewers (*improved* farmland)." The same dictionary defines "reclaim" in part as follows: "[T]o rescue from a wild or uncultivated state: make fit for cultivation or use."

The International Association of Assessing Officers defines the term "improvement" as "[a]nything done

---

'agriculture' and 'farming' shall include cultivation of the soil, dairying, forestry, raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training and management of livestock, including horses, bees, poultry, fur-bearing animals and wildlife, and the raising or harvesting of oysters, clams, mussels, and other molluscan shellfish; the operation, management, conservation, improvement or maintenance of a farm and its buildings, tools and equipment, or salvaging timber or cleared land of brush or other debris left by a storm, as an incident to such farming operations; the production or harvesting of maple syrup or maple sugar, or any agricultural commodity, including lumber, as an incident to ordinary farming operations or the harvesting of mushrooms, the hatching of poultry, or the construction, operation or maintenance of ditches, canals, reservoirs or waterways used exclusively for farming purposes; handling, planting, drying, packing, packaging, processing, freezing, grading, storing or delivering to storage or to market, or to a carrier for transportation to market, or for direct sale any agricultural or horticultural commodity as an incident to ordinary farming operations, or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market or for direct sale. The term 'farm' includes farm buildings, and accessory buildings thereto, nurseries, orchards, ranges, greenhouses or other structures used primarily for the raising and, as an incident to ordinary farming operations, the sale of agricultural or horticultural commodities. . . ."

to raw land with the intention of increasing its value. Thus, a structure erected on the property constitutes one very common type of improvement, although other actions, such as those taken to improve drainage, are also improvements. Although such cases are rarely intentional, 'improvements' can conceivably diminish the value of the land; note, however, that easements restricting the use and value of land are not considered improvements." International Association of Assessing Officers, Improving Real Property Assessment, A Reference Manual, p. 425.

Applying Webster's definition of "improve" to the definition of "farmland" derived from General Statutes § 1-1 (q), the essence of the test is that the land has been altered, changed or developed from its natural state, in a not inconsequential manner, in order to enhance or promote its use as farmland. Under this definition, the most virgin and rich Connecticut Valley farmland is not "improved farmland" if it has not been improved in some way. On the other hand, land of substantially less quality for farming may be "improved farmland" if a sufficient change from its natural state has occurred for farming purposes. Whether a particular parcel of land is "improved farmland" is, therefore, a question of fact for the trial court, to be determined by reference to this definition. The court must consider, under the totality of the circumstances, whether sufficient improvements in type, quantity or both have been made to all or part of a tract of land to justify such a classification. This case must therefore be remanded to determine the value of the district's property in terms of the value of improved farmland.

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.