[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM DATED FEBRUARY 6, 1996
This is a real estate tax appeal taken by the plaintiff, Metropolitan District ("District"), from the denial by the board of tax review for the town of Burlington of the plaintiffs application for a reduction of the assessment of its real estate on the grand list of October 1, 1988.
The District is a specially chartered municipal corporation.[1] On October 1, 1988, and for many years prior thereto, the District was the owner of 2,431.7 acres of land located in the town of Burlington, and used as a water reservoir.
The parties have stipulated that the total assessment set by the assessor for the 2,431.7 acres of land in the town of Burlington on the grand list of October 1, 1988, was $9,702,490.[2] The parties further stipulated that the taxable land owned by the District in Burlington was valued by the assessor at $5,700 per acre. Mathematically, 2,431.7 acres, valued at $5,700 per acre, results in a total market value of the subject land at $13,860,690.
The District challenges the decennial revaluation of the subject property on October 1, 1988, as well as the years of October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, and October 1, 1994.
The District's tax appeal is based on the claim that the Town did not follow the mandate set forth in General Statutes §12-76.[3] The parties have stipulated that the inhabitants of the town of Burlington do not have the right to use, and do not use, the District's water supply in Burlington upon the same terms as the District's inhabitants.[4]
CT Page 1433-A
The appraisers for both the District and the town acknowledge that the subject property is located in a R-30 residential zone, which has the following permitted uses:
 Single-family detached dwellings; Farming; Forestry and Forestry reserve; Fish and wildlife refuges; and Watershed management and similar conservation uses.
Both parties agreed that the scope of the appraisers' duties was to appraise the subject property as of October 1, 1988, "were it improved farmland" in accordance with General Statutes §12-76. Both appraisers agree that the term "improved farmland" is defined as land that has been altered or developed from its natural state in order to enhance or promote its use for farming. See Metropolitan District v. Barkhamsted, 199 Conn. 294, 303,507 A.2d 92 (1986).
The assessment of the subject property in 1987, prior to the October 1, 1988 revaluation, was $1,829,900, which equates to a total market value of $2,614,142.80, or $1,075 per acre. As of October 1, 1988, the subject property was revalued to $13,860,700 or $5,700 per acre. (Plaintiffs exhibit F, p. 18.) In 1989, the tax due the town of Burlington was $155,239.84, based on the 1988 revaluation. The revaluation more than doubled the District's tax burden of the previous year for an aggregate difference of $79,298.89. (Plaintiff's exhibit F, p. 18.)
As a general proposition, "[t]he goal of property valuation is to determine the `present, true and actual value' of the subject property." First Bethel Associates v. Bethel, 231 Conn. 731,738 (1995). True and actual value is synonymous with fair market value. Carol Management Corp. v. Board of Tax Review,228 Conn. 23, 34, 633 A.2d 1368 (1993). Fair market value, of necessity, takes into account the highest and best use of the land. Id. "Highest and best use `has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate.'" Id.
Under normal circumstances, the real estate owned by the District in Burlington would be valued at its fair market value. CT Page 1433-B See General Statutes § 12-63.[5] However, in the present action, the legislature has seen fit to define the highest and best use of the subject property of the District to be "improved farmland."
Prior to 1982, the District's charter provided that District property was to be assessed at "the average assessed valuation per acre of the improved farming land in such town." (Emphasis added.) See footnote 1, supra; Metropolitan District v.Barkhamsted, 199 Conn. 296-97.
As noted in Metropolitan District v. Barkhamsted, supra,199 Conn. 299, n. 3, in 1982 the General Assembly extended the language of § 12-76 to include land owned by municipal water districts created by special act. General Statutes (Rev. to 1989) § 12-76 provided in relevant part: "Land owned or taken by any municipal corporation, including any metropolitan district established under provisions of the general statutes or any special act . . . shall be assessed . . . at what would be its fair market value were it improved farm land, notwithstanding the provisions of . . . any special act." The only additional change to § 12-76 was made in Public Act 90-289, which amended subsection (a) to insert a reference to the assessment of land at a uniform rate as required by subsection (b) of § 12-62a.
We are guided by the legislative changes made to § 12-76
and the interpretation given to this statute and the District's charter by our Supreme Court in Metropolitan District v.Barkhamsted, supra, to conclude that comparable sales of "improved farmland" need not be restricted to land located in the town of Burlington.
Turning to the appraisal of the subject property made by the town's appraiser, Arthur P. Oles, we note that Oles defined highest and best use as "[t]hat reasonable and probable use that supports the highest present value, of vacant land or improved property, as defined, as of the date of the appraisal." (Defendant's exhibit 1, p. 8.) Oles goes on to state in his appraisal report that "[a]s defined, the highest and best use of the property as improved farmland is for single-family residential development . . . As improved farmland, the property is ideal for residential development, having been altered or developed from its natural state in order to enhance or promote its use for farming." (Defendant's exhibit 1, p. 8.) In his report, Oles analyzes ten sales of residentially zoned land in CT Page 1433-C north-central Connecticut. These ten sales of land ranged in price from $4,063 per acre to $20,226 per acre with a mean price of $7,040 per acre. Based on this analysis, Oles concludes that the subject property is valued as improved farmland as of October 1, 1988, with a most probable value of $6,000 per acre. $6,000 per acre, multiplied by the total acreage of 2,431.7, results in a determination by Oles of fair market value of the subject property as of October 1, 1988, of $14,590,200.
The District's appraiser, Edward F. Heberger, appraised the subject property using two scenarios. In scenario I, Heberger used comparable sales of land that "were purchased for, and had a highest and best use of, residential development." [Plaintiffs exhibit F, p. 36.)
Given the statutory mandate as expressed in § 12-76 to assess the District's land in Burlington at what would be its fair market value were it "improved farmland," we fail to understand the rationale of both Oles, and Heberger in scenario I, in using comparable sales that reflect the highest and best use as residential development rather than using comparable sales having the highest and best use as "improved farmland."
"Improved farmland" was not intended by the legislature to mean only "prime cropland cleared" or land specially suited for cultivation, but rather a broader definition to include land that has been altered or developed from its natural state in order to enhance or promote its use for farming. Id., 302-03. The court inMetropolitan District v. Barkhamsted approved the definition of farmland to include cultivation of soil, dairying, forestry and raising any agricultural or horticultural commodity. Id., 301. We would find it strange indeed to construe the meaning of "improved farmland" to be associated with anything other than the farming industry. Id., 302. We cannot equate the sale of improved farmland intended for a residential development to be associated with farming.
Although Oles and Heberger properly defined highest and best use, they misconstrued the definition of highest and best use as expressed in Metropolitan District v. Barkhamsted, supra, by using comparables related to the development of residential property. This approach of using the highest and best use of property for residential development when the legislative mandate is otherwise, is tantamount to each appraiser "marching to [his] own particular drummer." Metropolitan District v. Barkhamsted,
CT Page 1433-D3 Conn. App. 53, 69, 485 A.2d 1311 (1984), aff'd, 199 Conn. 294,507 A.2d 92 (1986).
Under ordinary circumstances, the town of Burlington would derive tax revenue from the District based upon the fair market value of its property located in the town of Burlington. However, the implicit assumption made by the legislature was that the formula for placing a value on a District's property "was that each acre of water supply land had a potential for improvement as farmland [and] that would never be achieved because the land had been taken for the purpose of a water supply, thus depriving the town of tax revenue it would ordinarily have realized."Metropolitan District v. Barkhamsted, supra, 199 Conn. 304. The legislative policy in dealing with fair compensation to nonuser municipalities and the District, "effectively balances the competing interest of the taxing town and the district's customers." Id.
In a tax appeal, the burden is on the taxpayer to prove that the valuation of its property was excessive or unjust. Rustici v.Stonington, 174 Conn. 10, 15, 381 A.2d 532 (1977). From the presentation of the evidence, we can only conclude that the assessor for the town of Burlington used the wrong standard in establishing the value of the District's land on October 1, 1988. The only way that the Burlington assessor could have arrived at a market value of $13,860,690, when the previous year's valuation was $2,614,142.80, was to have used comparable sales of land sold for residential development rather than for "improved farmland." (See Oles appraisal, defendant's exhibit 1, p. 6, Scope of the Appraisal.)
In scenario II, Heberger considered comparable sales of land that "had a highest and best use of farming." (Plaintiffs exhibit F, pp. 60, 79.) Due to a lack of comparable sales of "improved farmland" in the town of Burlington and surrounding communities, Heberger expanded his search throughout western and north-central Connecticut, for sales of improved farmland which were purchased for continuous farm purposes. Heberger selected nine comparable sales of land in scenario II with an unadjusted range of selling price per acre from $1,109 for a 130.15-acre parcel in 1985 to $2,273 per acre for a 13.2-acre parcel in 1988. All of these comparables were sales located in flood plains primarily along the Connecticut river. These comparables restrict the use of the land basically to farming, including cultivation of garden vegetables, corn and hay, and pasture use. Crop cultivation alone CT Page 1433-E minimizes the "improved farmland" use as defined in MetropolitanDistrict v. Barkhamsted, supra, 199 Conn. 301, which contemplates farmland to also include dairying and forestry. For this reason, we feel that, without additional reliable comparables, we should select comparables used in scenario II that represent the higher-priced comparables such as comparable one at $2,254 per-acre: comparable three at $2,273 per acre; and comparable four at $2,266 per acre. Using these comparables we conclude that the per acre market price for "improved farmland" in the town of Burlington on October 1, 1988, was $2,250. The total value of the District's land in Burlington using § 2,250 per acre is $5,471,325.
We have considered Heberger's use of the sales of farmland that sold with prior transfers of development rights to the state of Connecticut. These parcels ranged in price from $1,000 to $1,845 per acre. We did not use these comparables because the value of the land is intertwined with the grant of special tax privileges pursuant to the Farmland Preservation Act, §12-107a through § 12-107f, and we are not convinced that these prices, which are lower than the high range of flood-plain farmland, represent fair market value of "improved farmland" as defined by our Supreme Court.
The District and the town raise two additional issues. The first, raised by the District, is procedural. The District claims that the notice of increase that it received from the town was not sent within the time period mandated by General Statutes § 12-55,[6] but rather was sent to the District prior to the signing of the grand list abstract. The District argues that because the town did not strictly comply with the notice requirement of § 12-55(a) by sending the notice of increase too early, the increase in valuation is not effective until the 1989 grand list pursuant to § 12-55 (b).
The District was notified by the board of assessors of the town of Burlington on January 18, 1989, that it was increasing the District's assessment on the grand list of October 1, 1988. The town's grand list abstract for October 1, 1988, was signed and attested to by the assessor on February 28, 1989, pursuant to an extension granted under General Statutes § 12-117. (See Stipulation of Facts, para. A. 9.)
In the event of an increase of any property set forth on the list, a notice of such increase must be sent to the affected CT Page 1433-F property owner pursuant to § 12-55 (a). Section 12-55 (b) requires that a written notice of the increase of assessment must be mailed on or before the tenth day immediately following the date upon which the grand list is signed. In the event of a failure to give notice, § 12-55 (b) provides that the increase will not be effective until the next succeeding grand list.
We start with the basic proposition that the purpose of the assessor's notice to the property owner of any increase in assessment is for the protection of the individual taxpayer.Conzelman v. Bristol, 122 Conn. 218, 228, 188 A. 659 (1936).
The District acknowledges that it received the notice but argues that it should have received the notice only during a narrow period of time — between February 28, 1989, and ten days thereafter, to March 7, 1989. We cannot read § 12-55 (b) as narrowly as does the District. In construing statutory language, we must determine the essence of the thing that the legislature intended to accomplish. Katz v. Commissioner of Revenue Services,234 Conn. 614, 617 (1995). The legislative direction in §12-55 (a) was to give the District notice of any increase in the assessment of its property "on or before" March 7, 1989, so that the District could take appropriate steps to challenge any such increase. Section 12-55 (b) specifically provides that the increase shall not take effect until the next succeeding grand list only "[i]f such assessment increase notice is sent later
than the time period herein described." (Emphasis added.) We conclude that the District received adequate notice pursuant to § 12-55 (a).
The second issue is raised by the town. The town argues that the court should find that the District's land is taxable at 100% of its fair market value, rather than at 70% as originally assessed by the town, for the grand list years 1988, 1989, 1990 and 1991. The town argues that the land should be taxed at 100% because § 12-76 provided, prior to its amendment, effective October 1, 1992, that water district land "shall be assessed . . . at what would be its fair market value were it improved farm land." See General Statutes (Rev. to 1989) §12-76. Effective October 1, 1992, § 12-76 specifically provided that such land shall be assessed at the uniform 70% rate required by § 12-62a(b). Public Acts 1990, No. 90-289, §§ 1, 2. The town asserts that the court may correct the assessment under its broad power to "grant such relief as justice and equity CT Page 1433-G appertains." General Statutes § 12-117a.
The town assessed the property at 70% of its alleged fair market value for the years 1988, 1989, 1990, and 1991, as well as for the years subsequent to the amendment of § 12-76. (See Stipulation of Facts, para. A. 12.) The town presented no evidence at trial that it took any steps to officially notify the District of an increase in assessment or otherwise attempt to correct these allegedly improper assessments for the 1988 through 1991 grand list years to reflect a 100% assessment rate. When the District appealed the board of tax review's decision, it appealed the increase in the assessor's determination of the fair market value of the land. We will not, in an appeal challenging the determination of the fair market value of the land, change the rate of assessment for the years 1988 through 1991, when there is no evidence that the town ever took appropriate steps to change the assessment to tax the District at the 100% rate. See e.g.,National CSS, Inc. v. Stamford, 195 Conn. 587, 593-94,489 A.2d 1034 (1985). (The power of assessors to alter assessments exists only during the lawful period for the performance of their duties, before the grand lists are filed. Once assessors have completed their statutory duties, they have no authority to alter a list except to remedy a clerical omission or mistake.) Therefore, the District's assessment rate for the October 1, 1988, through October 1, 1991, grand lists should remain at the 70% rate originally imposed by the town.
Accordingly, the District's appeal is sustained. The assessor is ordered to reduce the fair market value of the property to $5,471,325 on the grand list of October 1, 1988, and subsequent grand lists, until the next revaluation, and to assess such property at 70% of its fair market value. This judgment shall enter without cost to either party.
ARONSON, J.