[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff has appealed to this court pursuant to Section8-30g of the General Statutes alleging that the Simsbury Zoning Commission acted illegally in denying its application for a change of zone which would permit the construction of 115 single family detached dwelling units, of which 23 units would be deed restricted in accordance with Sec. 8-30g(a)(1)(B).
The property involved in the application consists of 138.75 acres of undeveloped land situated in the I-2, General Industrial Zone.[1] To facilitate its development the plaintiff proposed CT Page 6550 that the zone classification be changed to R-15, an existing zone which permits single family detached dwellings on lots of 15,000 square feet.
This property is part of a 550 acre tract known as the "Powder Forest" which the plaintiff owns and which has been used for many years in connection with the plaintiff's business of manufacturing explosive devices. The property is located at the northeast corner of Stratton Brook Road (a town highway) and Bushy Hill Road (Route 167, a state highway)
The zone classifications adjacent to the site are predominantly R-40 single family residential (40,000 square feet minimum lot size) on the south and west with a triangle of R-15 at the northwest corner and a pocket of business zone at the southwest corner. The northeasterly boundary is zoned general business and the southerly boundary is the remainder of the Powder Forest zoned I-2 which contains the plaintiff's corporate headquarters as well as other general office uses.
At the consent of and in the presence of counsel and selected party representatives the court made a view of the site as well as accessible portions of the remainder of the Powder Forest. This inspection revealed the existence on the site of a former black gunpowder magazine which was evident from obvious signs of past soil disturbance. The record indicates that this magazine has not been used for a period of twelve to fifteen years. Approximately 380 feet from the easterly boundary of the site is another former storage area, the past use of which is not clearly identified. The record does however indicate that portions of the site were utilized by the plaintiff in the past in furtherance of its explosives manufacturing activities.
Further to the east on remaining land comprising the Powder Forest is what the record refers to as an "operations site". This installation consists of large piles of materials which are covered with black tar paper type material. While the record is silent on the point it was obvious from the view that the piled material was being held in storage for some future use or disposal. A drive through of some of the roadways which cross through the remainder of the Powder Forest revealed the existence of several small masonry buildings each of which was identified by a sign warning of the presence of explosives. In addition, it was noted that several of the areas in question were designated as "patrol areas". CT Page 6551
AGGRIEVEMENT
Based upon the testimony of Mr. Robert Stevens, manager of real estate development for Ensign-Bickford Realty Corp. and the deed to the property which is in evidence, the court finds that the plaintiff has been the uninterrupted owner of the premises at all times pertinent to these proceedings and thus the plaintiff is aggrieved. Goldfeld v. Planning and Zoning Commission,3 Conn. App. 72 (1975).
THE ZONING COMMISSION'S REASONS.
The Commission has assigned six reasons for denying the application. They may be summarized as follows: (1) the environmental history of the site and of the land adjacent to the site where gunpowder had been stored, and an explosion occurred, required further environmental assessment which the applicant failed to provide; (2) the need to preserve the land for future industrial development; (3) the site is incompatible with the intended use.[2] "When a zoning commission has stated its reasons the reviewing court ought only to determine whether the assigned grounds are pertinent to the considerations which the authority was required to apply, and whether they are reasonably supported by the record". First Hartford Realty Corporation v.Planning and Zoning Commission, 165 Conn. 533, 543 (1973). The action of the commission should be sustained if even one of the stated reasons is sufficient to support it. Zygmont v. Planningand Zoning Commission, 152 Conn. 550, 553 (1965). The key to the application of this test is whether any one reason is pertinent to the considerations which the zoning authority was required to apply. Unlike in conventional zoning appeals, the considerations which the authority is required to apply are not limited to Sec.8-2. With the enactment of Sec. 8-30g the legislature has created a new set of considerations which zoning authorities must apply in affordable housing cases.
I. THE ENVIRONMENTAL CONCERNS.
The plaintiff complains that the commission's environmental concerns are speculative, generalized and unfounded. It claims that it provided sufficient assurance that no activities either active (manufacturing) or passive (storage) have taken place on the site over the past fourteen years. It has represented to the commission that its testing, manufacturing, storage and waste CT Page 6552 disposal operations have occurred adjacent to but well away from the site. The record shows that black gunpowder was stored on the site twelve to fifteen years ago. As stated above, the location of both the former and the current storage sites was apparent from a view of the site.
According to a study performed by the town engineer there is a bunker where explosive materials are stored that is located within 300 feet of the site. The location of this bunker is not discoverable in the record nor was it identified for the court on its view of the site. In addition, the operations center of the manufacturing enterprise is in the center of the Powder Forest which of course is adjacent to the site.
In 1984, a gun powder explosion occurred within the operations area of the Powder Forest causing the death of an Ensign Bickford employee. As a result of that explosion the U.S. Dept. of Environmental Protection conducted an investigation of the Powder Forest and found evidence of (16) different hazardous substances underground.
Moreover, the applicant disclosed the existence of lead ground contamination on a portion of its plant site on the easterly side of Hopemeadow Street which borders the Powder Forest on the east. While the applicant represented to the commission that this condition would have no impact on the proposed development there is nothing in the record with respect to (a) possible similar contamination of the Powder Forest or, (b) whether there is any possibility that the contaminant could have leached underground from Hopemeadow Street to the subject site.
Recognizing the explosive nature of its manufactured product the applicant presented a letter to the commission advising it of its willingness to "relocate or scale back" some of its operations or storage facilities in order to comply with the distance requirements mandated by the Simsbury Fire Marshall for inhabitable buildings.
Each of these conditions caused the commission great consternation and concern and prompted it to inquire further into these subject matter areas. The record is replete with efforts on the part of the individual commissioners to obtain answers to questions propounded to the applicant's representatives concerning these environmental and safety issues. In each CT Page 6553 instance the applicant gave answers which were vague, incomplete and unsatisfactory to the commission. On numerous occasions the applicant indicated that Sec. 29-307a of the General Statutes prevented it from disclosing to the commission information concerning the existence, location, nature or characteristics of the explosive material which is manufactured, tested and stored within the Powder Forest.
Additionally, duly authorized representatives of the applicant either could not or would not provide this information. The following colloquies taken from Exhibit 74 are typical:
Robert Stevens. (RS) Page 22
"The remaining area, which is about a hundred and seventy some acres . . in the center, it is currently used for some EB operations. There's also a building over here which was built ah, for Aerospace Company . . aerospace. that building is no longer used and we're in the process of re-leasing that. There's a manufacturing building at this point, and then there's somesmaller operations that occur out of here and some storagefacilities.
MB: Storage of what?
RS: Storage of our products . . .
MB: Specifically, such as —
AB: Where's the nearest, where's the nearest . . . (inaudible)?
AB: are there any explosive material?
RS: I don't have that information . . (inaudible) we know that its off the site that we're dealing with.
MB: . . that photograph over here. Are there any active storage of bunkers in this vicinity right here? the materials? . . trying to . . where are all these . . . things, all these . . around here?
JD: (FB atty Jeanne Delehanty) I don't know what they are either
but first I don't know the date of the map. (audience and commissioners talking and reviewing map) . . . there's a variety of operations and storage facilities in this area for the — CT Page 6554
MB: (addressing audience) Could we just have a little quiet? If you want to talk, go outside and have a conversation out there, Thanks.
JD: for the manufacture of detonating devices. Ah, regarding the specifics, I don't know, and obviously they can change as, product comes in, product goes out.
MB: Is there anybody here, in your company could come to us andtalk to us about that activity? Your operations or whatever youcall it?
RS: Well I think that what you re trying to get at is the safetycomponent of the residential development, ah, I think EB first of all, the fence that Mr. Stevens was describing would be putting 75 feet to the east of the zone change line that's shown on the plans think Mr. Stevens already mentioned there are no operations whatsoever, ah, at all
TW: there are operations in the . . . (all talking at once)
MB: no, that's no the answer to the question —
. . but also environmental concern. I don't know if there are anyenvironmental studies that have been done on that property inquestion, but if there is indeed some storage of elements upthere and there has been storage for years, the potential existsah, on prior years particularly when there hasn't been a heightof sensitivity . . environmental problems for some of that tohave leached into the ground and spread into the site that we'reconsidering here. I think we'd be derelict in our duty not toexamine these issues. I'm not trying to give you guys a hard time. But I think they're real important.
BS: (Atty. Brian Smith) I think that, ah, I think for a zonechange application, especially this kind of zone changeapplication, you have to consider whether there's public water,public sewer available. Both of those, we got letters from the appropriate agencies stating that those are available. So you don't have the drinking well water issue, in any event. Ah, andsecondarily you have traffic concerns, I think . . be addressed because we have a full build out on industrial development, you're going to have more, far more traffic, if this is fully built up. Other environmental concerns, such as wetlands steep CT Page 6555 slopes, and that sort of thing, . . . addressed this, thoseissues with conservation commission, in fact they've given us afavorable referral, so I think that, you know, that's from the environmental viewpoint, they need to examine that, and they did, they . . positively about that. When it becomes a site specific issue, ah, you know, we are — are here showing you, the plans, and we will also provide to you so . . can say that, you know, from EB what we're gonna be doing is gonna be safe for the community. I think that's what we . . . for a zone change.
(Emphasis added).
The above excerpts from the hearing transcripts demonstrate clearly that the commission was frustrated in its efforts to reach a reasonable level of satisfaction with its knowledge of the environmental risks, if any, which the development presented.
The applicant's entire effort to assuage the commission's concern consisted of its presentation to the commission at one of its hearings of a letter from the town fire marshall Kevin Kowalski (Ex. 50d) and a letter from the manufacturing arm of the applicant (the Ensign Bickford Company) to the real estate arm of the applicant (Ensign-Bickford Realty Corp. ) (Ex. 44)[3].
The first of these documents invoke the confidentiality provisions of Sec. 29-307a. That document also invokes regulations promulgated by the Commissioner of Public Safety pursuant to Sec. 29-349 of the General Statutes concerning the storage of gun powder magazines and mandating minimum distances between gun powder magazines and "inhabitable buildings". The second document assures that the applicant will "relocate or scale back some of our operations or storage facilities . . . to maintain full compliance with federal, state and local laws". The applicant plainly asks the commission to accept these two letters in full satisfaction of its legitimate concerns for public safety. The record reveals that the applicant offered no evidence to the commission in the form of expert testimony or otherwise as to the effectiveness or appropriateness of the "American Table of Distances" in protecting residents from harm from the plaintiff's operations. The commission is entitled, in the view of this court, to make its own independent determination with regard to this issue. Is not bound to accept the table of distances at face value. The commission had no basis for evaluating the propriety of these distances. The court therefore believes and so finds that there was sufficient evidence in the record in a negative CT Page 6556 sense to support the commission's determination that it was necessary to deny the application in order to protect substantial public interests in health and public safety.
The court believes that based upon its knowledge on the 1984 explosion and the 1985 findings of the U.S. Department of Environmental Protection with respect to hazardous underground substances, the admitted ground water contamination east of the site and the existence of former gun powder magazines on the site and as well as the current presence of gun powder manufacturing and storage on adjacent land of the applicant, the commission acted reasonably and appropriately in demanding that its questions be answered.
Section 29-307a(c) provides in pertinent part that "notwithstanding the provisions of Section 1-19 the local fire marshall, any firefighter, and municipal health director or any water company shall maintain the confidentiality of and not disclose such information to any person". The statute makes disclosure an infraction. The plaintiff takes the position that this statute precludes it from telling the commission anything more than it did. At the same time, the court has the distinct impression that the plaintiff believes that it has supplied all the information that the commission is entitled to. The court disagrees.
While it is not a legitimate purpose of this proceeding to construe the meaning and scope of the above statutory language, the court notes that the class of persons whom the statute prohibits from disclosure is very specific and does not include the owner/applicant. Moreover, the court further notes that Sec.1-18a(e) of the General Statutes, especially subsections (3) and (5) allows a public agency such as the defendant commission to go into executive session under several discreet situations, one or more of which may be applicable here. The record is barren of any evidence of an attempt by either the applicant or the commission to treat this matter in executive session.
If the parties were uncertain of their ability either to disclose or to hold executive sessions they were free in advance of the hearing to petition the Freedom of Information Commission for a declaratory ruling under Sec. 4-176 or to initiate an action for a declaratory judgment for a ruling determining the exclusionary parameters of Sec. 29-307a(c).
CT Page 6557 A zoning commission, acting in its legislative capacity, is not limited to a consideration of conditions obtaining on a site which are definite or more likely than not to exist. A zoning commission is entitled to deny an application for a change of zone "where there is a possibility that approval of the application could result in environmental harm or physical injury to residents of the development as long as there is a reasonable basis in the record for concluding that its denial was necessary to protect the public interest. The record therefore must contain evidence concerning the potential harm that would result if the zone were changed . . . and concerning the probability that such harm in fact would occur" Kauffman v. Zoning Commission,232 Conn. 122, 156 (1995).
In this case, the following facts gleaned from the record constitute a reasonable basis for the commission to have concluded that its decision was necessary to protect the public interest: (i) past storage of gun powder on the site; (ii) active operations involving the manufacture and storage of gun powder on the applicant's adjacent property; (iii) ground water contamination east of the site; (iv) the 1984 explosion and the ensuing EPA investigation and findings; (v) the absence of evidence as opposed to representations as to each of the above. The court further finds that these concerns and the applicant's failure to address them are supported by sufficient evidence in the record and are necessary to protect the substantial public interest relating to health and safety. Indian River Associatesv. North Branford Planning and Zoning Commission,6 Conn. L. Rptr. 13, 372 (1992).
II. THE NEED TO PRESERVE THE LAND FOR FUTURE INDUSTRIAL DEVELOPMENT.
Primarily to enhance its property tax base, the defendant wishes to balance its predominantly residential community with controlled industrial uses. To accomplish this it has placed roughly 743 acres in industrial zonal classifications. The site in question comprises about 20% of that total.
The defendant argues that it has a substantial public interest in preserving this industrially classified land and that this public interest clearly outweighs the need for affordable housing.
The defendant relies heavily on Judge Berger's opinion inUnited Progress Inc. v. Borough of Stonington, (Conn. L. Rptr. CT Page 6558 March 4, 1994). In that case the court held that Stonington had a substantial public interest in preserving the only industrially zoned site in the borough and that under the particular circumstances of that case, which do not apply here, the public interest outweighed the need for affordable housing. The Stonington case contains numerous distinctive characteristics which make both its result and rationale inapposite here.
On the other hand, the court recognizes that a municipality has a legitimate public interest in promoting economic and social diversity within its limits by classifying a portion or portions of the land within its boundaries as industrial. Sec. 8-2. It also has the right to attempt to enhance its grand list. However, the plaintiff points to nothing in the record to support its claim that "the preservation of industrially-zoned land is a legitimate reason for denying even an affordable housing application". Neither the record nor the defendant's brief offers any evidence or analysis that the public interest in preserving this land for industrial development outweighs the need for affordable housing.[4]
 III. THE SITE IS FUNDAMENTALLY INCOMPATIBLE WITH THE USES PROPOSED.
The commission does not make clear what it means by "fundamental incompatibility". However, when read in conjunction with Reason Number 5 it becomes apparent that the nature of the use i.e. residential, and not the size or design of the project is what is objectionable. In other words, the commission here is simply saying that the site is appropriately zoned I-2 Industrial and should not be changed to residential. In Wisniowsky v.Planning Commission, 37 Conn. App. 303 (1995) the developer's affordable housing subdivision application was fundamentally incompatible with the applicable zoning regulations in that the proposed subdivision called for lot sizes ranging from 8,000 to 23,000 square feet whereas the applicable zoning regulations required minimum areas of 43,000 square feet. Affirming the trial court's reversal of the planning commission's denial of the subdivision application the Appellate Court held that "conformity (to zoning regulations) is not a mandatory prerequisite to approval of a subdivision application". The plaintiff construes the commission's findings of fundamental incompatibility as containing the implication that no matter what it did to modify the development the application would never meet with the commission's approval. The commission fails to bring to the court's attention any facts in the record which would render this CT Page 6559 site unacceptable for an affordable housing development under any circumstances. The court notes that the commission has failed to identify the characteristics of the site which would render it incompatible for use as an affordable housing development. Equally important is that implicit in such a universal determination is the principle that no amount of remediation (whether relating to environmental or traffic matters) can make the site compatible with the proposed use. There is no evidence in the record to support this conclusion.
For the reasons set forth in I. above, the appeal is dismissed.
MOTTOLESE, J.