[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this affordable housing land use appeal taken pursuant to Section 8-30g of the General Statutes the plaintiff seeks to construct 45 housing units on 11.4 acres of land in the R-40 Zone which permits multi-family development of four units per acre by special exception. On December 13, 1994 the defendant Commission, after public hearing, denied the plaintiffs original application which sought approval for 48 units for which it assigned several reasons which were related primarily to vehicular and pedestrian safety. On January 3, 1995 the plaintiff submitted a modification of its proposal which endeavored to address the concerns expressed by the Commission in its previous denial. On February 14, 1995 after further public hearing the Commission denied the modified application incorporating all of the reasons given in its previous denial and adding seven additional reasons.
The parcel in question is located at the easterly end of the R-40 Zone classification and is bounded on its entire westerly and southerly lines by residential zones (R-40 and R-30) and on its northerly and easterly lines by the I-Industrial Zone and the R-40 Zone.
The adjacent uses conform to their zone classifications including a 14.25 acre tract on the south east which contains 57 apartment units. Bordering the property on its entire easterly boundary is a former Penn Central (ConRail) railroad track right of way which has been designated for use as a recreational trail (hereinafter "the Trail") designed to serve hikers, bicyclists, skate boarders and others interested in the ecology and solitude of nature. The trail ranges in width from thirty three to sixty feet. Between the Trail and Old Farms Road, a public street, lie ten industrial uses. The largest and most active of these is the Avon Building Company, also known as the Sanford and Hawley Lumber Yard. Additional facts will be added as they become CT Page 4649 pertinent to the discussion.
AGGRIEVEMENT
Geoffrey Sager, the president of the plaintiff partnership testified that the plaintiff has been the uninterrupted holder of an option to purchase the subject premises at all times pertinent to this proceeding. He introduced in evidence an option agreement and notice of extension of option which confirmed the plaintiff's interest as an optionee until July 1, 1996. On the basis of these facts the plaintiff is found to be aggrieved. Goldfeld v.Planning and Zoning Commission, 3 Conn. App. 72 (1975).
THE STANDARD OF REVIEW
A trial court's approach to reviewing a zoning authority's denial of a special permit must begin with a statement of the principles that govern such review. "[A] zoning commission has no discretion to deny the special exception if the regulation and statutes are satisfied. When a zoning authority has stated the reasons for its action a reviewing court may determine only if the reasons given are supported by the record and are pertinent to the decision . . . . The zoning commission's action must be sustained if even one of the stated reasons is sufficient to support it." Feldsman v. Zoning Commission, 31 Conn. App. 674,678 (1993).
This traditional role must now be exercised in harmony with the provisions of § 8-30g(c) which, in shifting the burden of proof to the zoning authority, requires that the decision and reasons cited for the decision be "supported by sufficient evidence in the record". In Kaufman v. Danbury, 232 Conn. 122
(1995) our Supreme Court considered for the first time the meaning of the "sufficient evidence" standard in the context of a zoning commission's legislative function. In construing the term, the court rejected an attempt to equate that standard with the "substantial evidence" standard that ordinarily applies to zoning decisions which are administrative in nature. Instead, the court approved a more relaxed standard that historically has applied to legislative as distinguished from administrative zoning decisions. Thus, while acting in its legislative capacity a zoning commission has the burden to show that "the record before the [commission] supports[ed] the decision reached", WestHartford Interfaith Coalition, Inc. v. Town Council, 228 Conn. 498
(1994), and that the commission did not act arbitrarily . . . CT Page 4650 illegally, . . . or in abuse of its discretion" (Internal quotation marks omitted). Protect Hamden/North Haven fromExcessive Traffic and Pollution, Inc. v. Planning and ZoningCommission, 220 Conn. 537, 543-544 (1991).
Distinguishing the special exception proceedings as administrative in nature the plaintiff argues that the substantial evidence rule should apply to this proceeding. Huckv. Inland Wetlands and Watercourses Agency, 203 Conn. 525 (1987). On the other hand, the defendant cites the legislative history of Section 8-30g to support its position that the sufficient evidence standard is the appropriate one.
Other judges of this court do not seem to be in agreement. Prior to Kaufman, Judge Berger espoused the position that "sufficient evidence" means the same as "substantial evidence".T.C.R. New Canaan, Inc. v. Planning and Zoning Commission,6 Conn. L. Rptr. 4, 91 (March 30, 1992). In Nizza v. AndoverPlanning and Zoning Commission, CV93 0526193, Superior Court, Judicial District of Hartford/New Britain, September 30, 1994, and Rinaldi v. Suffield Planning and Zoning Commission, CV94 533603, Superior Court, Judicial District Hartford/New Britain, January 4, 1995, Judge Leheny seemed to apply the sufficient evidence standard in both a subdivision and special permit case, citing the legislative history of Section 8-30g. As with several affordable housing appeals previously decided by this court, see, e.g. Pratt's Corner Partnership v. Southington Planning andZoning Commission, 9 Conn. L. Rptr. 10, 291 (June 21, 1993), the record and briefs in this case do not facilitate a resolution of this issue. What is clear however, is that the defendant's claim that the statutory "sufficient evidence" standard is satisfied as long as "some evidence" exists in the record to support the decision and its reasons fails to satisfy either the administrative rule enunciated in Huck or the legislative rule referred to in Kaufman. At the very least, the commission's action must be reasonably supported by the record. Feldsman v.Zoning Commission, supra.
THE DEFENDANT'S REASONS
At oral argument the plaintiff abandoned its right to pursue an appeal of the commission's initial decision of December 13, 1994 and instead confines its appeal to the modified proposal of January 3, 1995. Although the commission gave a total of sixteen reasons for denying the application, the defendant's brief CT Page 4651 explicitly abandons all but five of them. Moreover, at oral argument the defendant further abandoned reliance on all but the three reasons that are discussed below.
1. The close proximity of children and others to numerousindustrial uses and industrial traffic is inherently dangerous.
As this court said in Nichols v. Killingly Planning andZoning Commission, CV94 0540477, Superior Court, Judicial District of Hartford/New Britain at Hartford (June 5, 1995) "That traffic safety constitutes a substantial public interest [under § 8-30g(c)(2)] warranting protection is beyond debate. That it constitutes a valid and pertinent reason for a zoning commission to deny a [special permit] has long been recognized in our fabric of zoning law. First Hartford Realty Corp. v. Planningand Zoning Commission, 165 Conn. 533, 544 (1973); Farina v.Zoning Board of Appeals, 157 Conn. 420 (1969)".
The facts of this case present a different twist to the ordinary zoning case involving traffic safety. Most of those cases involve projects which themselves would increase the volume of traffic on the streets, Grace Community Church v. Planning andZoning Commission, 42 Conn. Sup. 256 (1992) or aggravate or create dangerous conditions on the highway, Primerica v. Planningand Zoning Commission, 211 Conn. 85, 98 (1989). In this case it is not the introduction of new traffic by the housing development, either in number or type of vehicles, which creates the problem but rather the arrival of children and other pedestrians who will live in the development whose presence will overflow onto the street.
The estimated number of children likely to reside at the site ranges from a high of 57 given by Brian Miller, a planning consultant, to a low of 25 as projected by the Avon Town Planner and the Avon Superintendent of Schools. The plaintiff itself estimates that somewhere between 25 to 35 school age children will inhabit the site. The commission made no finding of any specific number. The commission was not concerned with the presence of children within the development as long as they are confined within the boundaries of the development. Rather, the commission's overriding concern was with activities of these children off-site.
The defendant's apprehension over child safety is summarized in its brief at page 16. CT Page 4652
"The proposed development will necessarily direct these children into Sandscreen Road where they would wait for the school bus in the morning during peak morning traffic hours; where they would be dropped off in the afternoon; and where they would play, ride their bicycles, skate board, roller blade, and engage in other activities. There, they would inevitably conflict with heavy industrial truck traffic servicing Avon Building Supply across the road, and the other industrial uses in the vicinity. These children would be in harm's way."
This case also differs from the usual traffic safety zoning case in that the commission was not concerned with automobile traffic because the evidence before the commission showed that after completion of the 45 units, the level of service at Sandscreen and Old Farms Road will remain at level A at peak hours. Its concern rather was with truck traffic generated by Avon Building Supply and other industrial users on Sandscreen Road.
The record reveals that large tractor trailers and fourteen-wheelers make an average of 70 to 100 trips per day down Sandscreen Road from Old Farms Road, across the Trail and past the entrance to the proposed development. As many as 15 of these trips are made during peak morning hours. The plaintiff argues that this condition has existed for the last twenty years without the commission initiating any action to alter the zone classification from multi-family.
The intervenor, The Avon Building Supply Company calls the court's attention to the testimony of its expert engineer, Mr. John Thompson, who opined that given a 3 foot tall child a driver of one of these trucks would have his sight line limited primarily by the hood of the truck in an arc comprising approximately 75% of the area in front of the vehicle and extending out a distance of 26 feet on both sides of the front of the vehicle. In addition to the driver's restricted line of sight, the record confirms the obvious that it takes considerably longer for the driver to bring one of these heavy vehicles to a complete stop than it does an automobile, although the record contains no engineering data on this point.
Mr. Thompson's testimony undoubtedly forms the principal basis for the commission's conclusions on this subject. Thus it is important to examine his opinion carefully. In his memorandum CT Page 4653 of October 25, 1994 (Exhibit 34) Mr. Thompson gives the following opinion.
"From a public safety and welfare standpoint, the introduction of residential development into an already extensively developed industrial area is clearly undesirable. The unnecessary mixing of residential passenger vehicle traffic with the truck traffic from the commercial/business activities is undesirable and should be avoided. A statistical assessment of the available data indicates that there would be a significantly higher potential for truck-pedestrian accidents due to the introduction of pedestrians into an environment that for the most part does not involve pedestrians, much less preschool and school-age children.
In conclusion, it is clear from a technical and safety standpoint that the mixing of truck traffic, passenger car traffic, and pedestrians in an industrial area is not desirable and is something that should and can be avoided."
In his testimony before the commission on January 24, 1995 Mr. Thompson said "You have children who wander around and place themselves at risk when heavy truck traffic that's traveling in and out of that area . . . . Our position is, as we stated previously, if you can avoid mixing children, passenger traffic and heavy truck traffic, it's a desirable thing to do at this location. It's something that can and should be avoided."
The activities to which Mr. Thompson refers arise in part from children waiting for the school bus but would also include those described by the intervenor as roller blading, skate boarding, biking and perhaps others. They articulated a fear that these children will not confine their activities to the sidewalk or other permitted pedestrian accessways but rather will wander into the street. The court notes that there is no expert testimony in the record that concludes that children would be more likely than not to wander into or play on Sandscreen Road or Old Farms Road in the circumstances of this case. While the members of the commission were entitled to rely on their own knowledge of the area to confirm facts to which witnesses have testified, Primerica v. Planning and Zoning Commission, supra at p. 97, they may not do so with regard to beliefs or opinions. And yet, this reason was predicated on just such a belief. Feinson v.Conservation Commission, 180 Conn. 421 (1980). Reason number 4 as stated in its decision of February 14, 1995 is as follows: CT Page 4654
"The altered grading of and remote location of proposed recreational areas render their use by children less likely. The probability of their migration toward, and congregation in, the areas of danger along Sandscreen Road and the industrial facilities is increased under the proposed modification. Although the altered location of the school bus stop and widening of Sandscreen Road are helpful, the congregation of children from 45 households in proximity to industrial uses, heavy truck and other industrial traffic, and mixed-use traffic is inherently dangerous."
This reason breaks down into three parts. First, children will be "less likely" to use the built-in recreational facilities; second, the "probability" is that children will migrate onto Sandscreen Road exposing themselves to danger; and third, the "congregation" of these children in proximity to industrial uses and . . . truck . . . traffic . . . "is inherently dangerous".
The court must examine the record to ascertain if there is sufficient evidence to support this reason. It is noted that Mr. John Thompson did not render any technical opinion which would support this conclusion. At most, Mr. Thompson stated that the mix of children and other pedestrians with heavy truck traffic should be avoided. Moreover, the commission rejected the contrary testimony of the plaintiff's engineer, Mr. James Bubaris, as unreliable which of course the commission had the right to do.Manor Development Corp. v. Conservation Commission, 180 Conn. 692,697 (1980).
The commission made this finding in the face of a negligible record of one traffic accident per year on average. Additionally, there was a total omission of criticism of traffic safety issues by persons who would be expected to supply such criticism, namely, the Avon Chief of Police, Town Planner, Town Engineer and Superintendent of Schools, each of whom made a report to the commission. Curiously, the commission chose to interpret these omissions negatively. The court believes that it is disingenuous for the commission to infer a lack of approval of traffic safety issues from these omissions when the commission should have recognized that it was the sworn responsibility of these officials to protect the safety of the Avon public either directly as in the case of the Chief of Police or indirectly in the case of the Town Planner. See, Luery v. Zoning Board,
CT Page 4655150 Conn. 136, 145 (1962).
This reason is likewise controverted by abundant evidence in the record of the Town of Avon's active support for and participation in the creation of the Rails to Trails project. As indicated above, the Trail runs along the entire easterly boundary of the plaintiff's property. The Trail is a 25 mile long regional recreational tract of which 4.5 miles of its length passes through the town of Avon. The Trail is designed for use by hikers, strollers, joggers, bicyclists, roller bladers, skate boarders, cross-country skiers, nature lovers and for miscellaneous other recreational uses. The Trail intersects Sandscreen Road at the northeasterly corner of the plaintiffs property and the southwesterly corner of the property of the intervenor, Avon Building Supply Company, and is south of the entrance to the lumber yard. Not only will all vehicles destined for the plaintiff's property be required to cross it but so too will all truck traffic destined for the lumber yard. Based upon the city of Cheshire's experience with Rails to Trails, the plaintiff estimates that it will be utilized by approximately 500 persons per day. Even assuming that this number will be attained mainly on weekends when the weather is favorable, a substantially lesser number per day will expose far more pedestrians to the dangers of truck traffic than would the upward of 57 children who might inhabit the plaintiff's development. Moreover, unlike the children whose unapproved "migration" into the street will be discouraged, indubitably the Trail users will be invited to cross the street at this intersection.
While there is no evidence of direct involvement by the defendant planning and zoning commission, the record is replete with exhibits evidencing the commitment of the government of the town of Avon to the trail project. For instance, in 1992 the Town Council passed a resolution endorsing the concept and directing its staff to file an application for state and federal funds to assist in the improvement and ordering its staff to cooperate with other participating municipalities. In 1993, the Town Council passed a resolution authorizing Avon to provide up to 20% of the engineering costs of the project. In 1994, it instructed the Town Manager to discuss with the Connecticut Department of Transportation a commitment of staff to the project and in the same year the Town Board of Finance appropriated $9,000 for design and engineering. In July, 1994, the town applied to the state for $50,000 for the project and in November of 1994 the state gave the project its top priority for funding. All of these CT Page 4656 had been accomplished and were pending at the time of the commission's hearings in late 1994 and early 1995. In reliance on the eventual completion of the Trail project the plaintiff has designed direct sidewalk access from the development to the trail. Although construction had not yet begun, completion of the Trail project was indeed a reasonable probability. Jarvis Acres,Inc., v. Zoning Commission, 163 Conn. 41 (1972).
The likely benefit flowing from direct sidewalk access to the trail should have been obvious to the commission. Even the Chief of Police recognized the benefit of direct sidewalk access in his memorandum to the commission dated January 13, 1995 which allayed his previous concern that the lack of direct access to the Trail might cause pedestrians to gain access to the Trail by using Sandscreen Road.
The commission has stated in its brief that there would be nothing wrong with the plaintiff's site plan if the development were located somewhere else in town. A special exception is a use which the zoning regulations expressly permit under conditions specified in the regulations. W.A.T. R. Inc. v. Zoning Board ofAppeals, 158 Conn. 196, 200 (1969). The nature of the use in question, i.e. multi-family affordable housing, cannot be called into question by the commission under the Avon zoning regulations. Section VIII of the regulations governs special exceptions and 9 "Criteria" are listed. Only Criteria A, I and possibly C would apply to this application. Under A, the location, size, nature and intensity of the proposed use must be compatible with other existing uses. As in Grace Community Churchv. Planning and Zoning Commission, supra, at 264, where the court recognized that any development will cause some increase in traffic, so too in the R-40 zone, a multi-family development must necessarily bring with it an influx of school age children. Children are the inevitable consequence of all housing developments, except those that are restricted to the elderly.
The court concludes that the commission has failed to satisfy its burden of proof that there is sufficient evidence to support this reason. The commission's decision to deny the plaintiff's application on the ground that to do so is necessary to protect the public interest is arbitrary and unreasonable. As will be seen, subsequently, there are numerous safeguards available to the commission to assuage its concerns on this issue.
2. The sight line from Sandscreen to the north along Old FarmsCT Page 4657Roads is substandard.
There is uncontroverted evidence to support this conclusion. However, there is compelling evidence in the record which contradicts the commission's findings as expressed in Reason 5 that improvement to the sight line can only be achieved by acquiring rights from an uninvolved property owner over whom the commission has no authority.
The commission had before it two very different standards applicable to this intersection. It had the minimum standard required by the Connecticut Department of Transportation for design of intersections, i.e. 10 feet at a set back of 350 feet, and the desired optimum standard of 20 feet at a set back distance of 500 feet. On the strength of the testimony of John Thompson the commission opted to exact the higher standard when its town engineer Tom Dawkins, consulting engineer James Luzzi, Town Planner, Mr. Kushner and the Avon Police Department all agreed that the Connecticut Department of Transportation standard was the correct one to apply to this intersection. In fact, they all agreed that the plaintiff's design for the modification to the intersection exceeds the Connecticut Department of Transportation standard. As Barkin Mess, Traffic Engineers and Planners stated, the sight line will be 13 to 14 feet behind the required reference line which falls above the minimum required by the Department of Transportation but below the 20 feet stated by that Department to be desirable.
So, contrary to the claim made in its brief, it is not a question of the commission's right to believe Mr. Thompson over the plaintiffs expert testimony, but rather the Commission's right to insist upon a standard that is double the minimum standard permitted and approved by the Connecticut Department of Transportation.
While it cannot seriously be disputed that the Avon Planning and Zoning Commission has a public interest in promoting traffic safety by the most effective means available to it, it is open to question whether that public interest rises to the level of substantiality required under Section 8-30g(c)(2).[1] However, lofty its goal may have been, this court holds that in the circumstances of this case the requirement that a traffic intersection adhere to optimal rather than minimal acceptable standards is not a substantial public interest which a zoning commission is entitled to protect under Section 8-30g(c)(2). It CT Page 4658 is significant in the court's view that the commission engaged in no discussion of whether the minimum standard as opposed to the optimum standard would have been sufficient to protect the public interest in traffic safety, nor is there anything in the record to indicate how the need for one standard but not the other would have outweighed the need for affordable housing.
The commission has failed to satisfy its burden of proof under Section 8-30g(c)(1)(2) or (3).
3. The proposed development is not compatible with thesurrounding and abutting industrial uses.
According to the defendant's brief this reason is a hybrid between the commission's perceived concern for pedestrian safety and the prognosticated effect which the development may have on existing industrial neighbors. Although silent, the December 13, 1994 reasons for denial indicate that the statutory basis for this finding may be found in Section VIII, A, B, C, and E of the zoning regulations.
Protection of property values in the neighborhood of the proposed use has always been recognized as a legitimate purpose of zoning. Karen v. East Haddam, 146 Conn. 720, 729 (1959). To put it another way, the commission has stated, in effect, that this multi-family development will introduce too many children into the neighborhood and therefore the density of children will be too high, and so the value of the existing industrial properties will be harmed. This court has previously held that in enacting Section 8-30g "the legislature has already determined than an affordable housing development should not, solely by its nature, be considered harmful to property values." Pratt's CornerLimited Partnership v. Southington Planning and ZoningCommission, supra at 129. To argue that an increased number of children in the neighborhood would tend to drive out existing businesses and alter the character of the neighborhood unfairly makes families with children unwanted citizens in busy neighborhoods and imputes to business owners an unwillingness to act responsibly in a dense mixed residential-commercial environment. Such a finding not only has no basis in the record but it is unrealistic in today's society.
Implicit in this reason and argued at some length by the defendant is that the proposed development is bad planning because multi-family zoning exposes a large number of people to CT Page 4659 existing industrial users. In fact, Brian Miller, a planning consultant, testified that the proposed development was "certainly incompatible with the neighboring uses, particularly the industrial heavy uses." The Town Planner, Mr. Kushner, pointed out at the October 25, 1994 hearing that the site was very "sensitive" and that there was a need to find "an appropriate transitional land use" to protect the neighborhood. Likewise, the planning report prepared by Harrall — Michalowski Associates, Inc., states the following: "The concept of high density residential development acting as a buffer between a single family residential neighborhood and a land use with detrimental impacts on the residential environment is no longer considered to be a valid planning concept because it results in the exposure of a greater number of people to the land use with the adverse impacts." In effect, the expert advised the commission that the R-40 zone with its multi-family component was an inappropriate zone classification for this site. In fact, the plan of development which was adopted in 1991, designates this property as part of neighborhood number 4. It acknowledges that the neighborhood has "limited amounts of vacant land in residential zoning". While expressing its concern that this land must be developed "in a sensitive manner", it fails to relate this need to the existence of the industrial uses which it now finds incompatible. Indeed, it is curious to note that while characterizing this property as "sensitive" it also describes it as "most suitable for development" (Plan of Development, p. 22, Ex. 183A.) Indeed, the zoning history of this property shows that it was removed from the industrial zone and placed in the R-40 zone in 1975. In 1985 the commission reaffirmed the appropriateness of the zonal classification when it denied an application to rezone this land to I-Industrial. Consistent with the appropriateness of the R-40 classification the commission approved a 46 unit, two bedroom project for the site in 1981 and annually granted one year extensions of that approval until 1991. The intervenor argues however that conditions have changed substantially since 1991 because the railroad line which is the principal means of transportation of its product was shut down in that year, thus necessitating delivery of its lumber by truck rather by rail car. The fact remains that between 1991 and 1994 when this application was filed the commission failed to change the zonal classification to one which it believed to be more appropriate for the neighborhood. It may not now avail itself of this special permit proceeding to proclaim its belief that the property is inappropriately zoned. CT Page 4660
Generally a municipal plan of development adopted under Section 8-30g of the General Statutes is advisory only except as to municipal improvements and subdivisions as to which it is controlling. Purtill v. Town Planning and Zoning Commission,146 Conn. 570 (1959). One would expect a zoning commission to be guided by the plan. Mott's Realty Corp. v. Town Planning andZoning Commission, 152 Conn. 535, 538 (1965). In fact, consistency of a zoning commission's action with a plan of development has usually been recognized as a valid and proper reason to support the agency's action. Calandro v. ZoningCommission, 176 Conn. 439, 441 (1979).
The fact that this property remains in the R-40 classification must be considered in light of two important points. First, the plan of development recognizes the need in Avon for "affordable single family and multi-family opportunities". Secondly, neither the plan of development, nor the zoning map nor the zoning regulations contain any mechanism especially designed to fulfill that need. Thus, one must unavoidably conclude that these affordable housing opportunities are to be met within existing residential zones. This is especially true in view of the mandate of Section 8-2(a) that zoning regulations "encourage development of housing opportunities for all residents of the municipality and the planning region in which the municipality is located". BuildersService Corp. v. Planning and Zoning Commission, 208 Conn. 267,305 (1988). The same statute also requires that the regulations promote housing choice and economic diversity in housing, including housing for both low and moderate income households". This provision has been in effect since 1991 but the defendant commission has failed to respond to the legislative call (P.A. 91-392).
In conclusion, this commission may not deny an application for special permit seeking approval of an affordable housing development under Section 8-30g on the grounds of incompatibility with neighboring uses when it has been delinquent in its responsibility to comply with the relevant provisions of Section8-2 by enacting affordable housing regulations or creating zone classifications in its comprehensive plan to accommodate affordable housing. The commission has failed to satisfy its burden of proof as to this reason. Section 8-30g(c)(1).
Although given scant discussion by the defendant in either its brief in chief or its reply brief, every affordable housing CT Page 4661 appeal must address the issue of whether the announced reasons for denial clearly outweigh the need for affordable housing. Section 8-30g (c)(3). In its decision of December 13, 1994, the commission makes no mention whatsoever of public interest versus need. In the February 14, 1995 decision the commission states (Reason 8) "the need for affordable housing is clearly outweighed by the safety issue and other public interests".
In Pratt's Corner Partnership, supra at 293, this court said "in order to comply with the statute and sustain its burden of proof when it denies an application for an affordable housing development, the zoning authority must specifically articulate through the reasons it gives how and why each of the precepts embodied in subsections (2), (3) and (4) supports its denial. In other words, the assigned reasons must address categorically . (1) the necessity to protect a particularly identified public interest or interests; (2) must reflect that the commission engaged in the balancing test dictated by subsection (2); and (3) must manifest an honest effort to devise reasonable changes to the development that would protect the public interest that is jeopardized by the proposal. A decisional format that presents anything less than this abdicates the zoning authority's solemn responsibility and impedes meaningful judicial review. Nothing less should be required under a remedial statute of this nature.Keyes v. Brown, 155 Conn. 469, 474 (1977). At the same time the reasons need not be in a form to satisfy the meticulous criteria of a legal expert. Protect Hamden, supra at 554".
The commission argues that "there can hardly be a dispute that the need to protect the public from the dangers of heavy truck traffic outweighs the need for affordable housing", implying that such a conclusion should be obvious. A review of the record fails to reveal that the commission engaged in any discussion calculated to balance the need with safety except for Commissioner Meyers who stated in his resolution of February 14, 1995 that the commission is approving affordable housing in other areas of Avon. While this may have some validity, the fact is not apparent from the record, the zoning regulations, the plan of development, the zoning map, or the records of the department of housing which in 1994 certified Avon as having only .99% of its housing stock devoted to occupancy by persons of low and moderate income. Moreover, the commission has failed to manifest an honest effort to devise reasonable changes to the development that would protect the public interest in safeguarding pedestrian safety. CT Page 4662
THE REMEDY
Section 8-30g(c) empowers the court to "wholly or partly revise, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." The plaintiff argues against remand on the ground that its plan for the development has been aired exhaustively and that there is no point in remanding for further refining. The defendant seems to acquiesce in the belief that the commission has done all it can. However, it incorrectly basis this belief on the mistaken impression that the only course of action open to it to achieve compliance with subsection (c)(4) is to order the plaintiff to reduce the number of housing units and thus the number of children in its development. Plainly, this is not the only remedy open to it.
The record is replete with references to measures which the commission may employ to reduce and even minimize the undesirable possibility that pedestrians might be exposed to physical injury from tuck traffic. Examples of some protective measures which the commission might find effective are explicitly mentioned in the record and others should be obvious to the commission. These are among others: sidewalks with or without barriers, traffic control devices, warning lights and signage, speed limits, radar monitoring, pavement markings. It is only fair that the commission be given an opportunity to adopt whatever measures are appropriate to maximize safety consistent with the requirement of subsection c(4) that these measures not have a substantial adverse impact on the viability of the development.
Accordingly, the court orders that the plaintiff's modified application be approved by the commission under such reasonable terms and conditions and with such reasonable changes as the commission might prescribe within the parameters of this opinion. For this purpose and to this end the decision is hereby remanded to the commission. The commission is further ordered to hold a public hearing for the limited purpose of determining the most appropriate way to comply with this order. The commission's actions shall be completed within ninety days unless extended by the court for good cause shown.
MOTTOLESE, J.